WILLIAM T. JACOBS, PLAINTIFF-APPELLANT, AND BOARD OF TRUSTEES, PUBLIC EMPLOYEES RETIRING SYSTEM AND EDEN S. EWING, PLAINTIFFS-INTERVENORS, v. NEW JERSEY STATE HIGHWAY AUTHORITY, GARDEN STATE PARKWAY, D. LOUIS TONTI, EXECUTIVE DIRECTOR, AND SYLVESTER C. SMITH, CHAIRMAN, DEFENDANTS-RESPONDENTS.

Argued March 17, 1969—Decided July 14, 1969.

394

*Mr. Frederick E. Popovitch* argued the cause for plaintiff-appellant William T. Jacobs and for plaintiff-intervenor Eden S. Ewing (*Messrs. Toolan, Romond & Burgess,* attorneys).

*Mr. Theodore A. Winard,* Deputy Attorney General, argued the cause for plaintiff-intervenor Board of Trustees, Public Employees Retirement System (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. Theodore W. Geiser* argued the cause for defendants-respondents (*Mrs. Sonia Napolitano,* on the brief; *Messrs. Pindar, McElroy, Connell & Foley,* attorneys).

The opinion of the court was delivered by

FRANCIS, J.   The issue here is the propriety of the action taken by the New Jersey State Highway Authority in forcing plaintiffs Jacobs and Ewing, two of its employees, to retire, Jacobs at age 66 years and Ewing at 65½ years. This was done pursuant to a department regulation issued on October 30, 1964. On that date all employees were notified that the Authority Commissioners had adopted "a retirement policy [to become effective January 1, 1965] which provides that all Authority employees shall retire upon attaining age 65." The regulation authorized the Personnel Committee upon application of a department or Staff Division Head to extend the retirement date of an employee with the approval of the Executive Director of the Authority.

Ewing became an employee of the Authority on August 16, 1954, Jacobs on September 2, 1954. This was 10 years before promulgation of the retirement rule. Ewing reached 65 years of age on April 5, 1967, and following the grant of a six months' extension of employment, he was retired "in accordance with the policies of the Authority." Jacobs be-

came 65 years of age on April 15, 1965, but his retirement was delayed for one year "in order to train a replacement" for him. He applied for an additional extension but it was denied; his forced retirement from service became effective on April 15, 1966 at age 66 years. Upon retirement Ewing and Jacobs, having been contributing members of the Public Employees Retirement System (PERS), *N. J. S. A.* 43:15A–1 *et seq.*, began to receive pension payments based upon the service credits each had accumulated therein.

After considerable time had elapsed Jacobs instituted this proceeding attacking his compulsory retirement as illegal and seeking an order restoring him to employment. The attack was and is based upon the contention that under PERS, *N. J. S. A.* 43:15A–47, which he contends is controlling with respect to retirement from public employment, retirement is voluntary between age 60 years and 70 years and only becomes mandatory at age 70 years.

█ The suit was brought in the Superior Court, Chancery Division, but since it was properly cognizable in the Appellate Division under *R. R.* 4:88–8, it was transferred there for determination. See *R. R.* 1:27D(a). We pause to note that the suit was begun long after expiration of the time limit fixed for such actions by *R. R.* 1:3–1(b) or any extensions thereof under *R. R.* 1:27B(d). As a result, the Authority moved to dismiss, but in view of the importance of the public question involved, the Appellate Division felt there should be a decision on the merits. Consequently the motion was denied. This Court likewise is of the view that the meritorious issue should be resolved.

The Appellate Division concluded that the Authority was empowered by *N. J. S. A.* 27:12B–5(q) of its creating act *N. J. S. A.* 27:12B–1 *et seq.* governing the appointment of its employees, to adopt the general mandatory retirement policy which was applied to Jacobs. It therefore affirmed the order requiring him to retire. The Attorney General moved to intervene on behalf of the Board of Trustees of the Public Employees Retirement System, and also filed a petition for

certification. Both applications were granted. Prior to argument Ewing, whose situation is the same as that of Jacobs, asked leave to intervene. The motion was granted and the matters presented at the same time.

█ The New Jersey State Highway Authority was created by *N. J. S. A.* 27:12B–1 *et seq. Section* 5 (q) thereof confers power on it

"To appoint such additional officers * * * and employ such consulting engineers, attorneys, accountants, construction and financial experts, superintendents, managers and other employees and agents as the Authority deems advisable and as may be necessary in its judgment; to fix their compensation; and to promote and discharge such officers, employees and agents; all without regard to the provisions of Title 11 of the Revised Statutes."

Thus the Authority was given broad power to hire, promote and discharge employees free of the restraints imposed by the *Civil Service Act, Title* 11, *N. J. S. A.* Accordingly its employees cannot acquire tenure, and are ordinarily subject to discharge without the benefit of charges, hearing thereon and establishment of good cause.

█ It may be noted that although the statute speaks of hiring, promotion and discharge, no mention of "retirement" appears in any of its various sections. Retirement from employment has a connotation different from discharge. The former ordinarily signifies voluntary withdrawal, the latter compulsory dismissal. See *Brown v. Little, Brown & Co.,* 269 *Mass.* 102, 168 *N. E.* 521, 66 *A. L. R.* 1284 (1929); *People ex rel. Tims v. Bingham,* 166 *N. Y. S.* 28 (*Sup. Ct. Spec. Term* 1906). The statute neither contains provision for the establishment of an individual pension fund for Authority employees, nor any reference whatever to pension benefits for them. Since the absence of a pension plan for public employees in these modern times would be most unusual, we must look beyond the particular statute in determining whether an applicable legislative provision for pension benefits exists. Such a provision is found in the

comprehensive Public Employees' Retirement System, particularly *N. J. S. A.* 43 :15*A*-7.

This Act established a pension system for State employees. *Section* 7 (c) as it appeared in 1954 required all persons accepting employment in the classified service of the State to enroll therein as a condition of employment. *L.* 1954, *c.* 84, § 7, *p.* 479[1]. In 1955 employees of the New Jersey Highway Authority were expressly included in the public retirement system. *L.* 1955, *c.* 261, § 19, *p.* 977; *N. J. S. A.* 43 :15*A*-73.[2] *Subsection* (a) of *Section* 73 provided:

"Upon such enrollment, the said employees shall be subject to the *same contribution and benefit provisions of the retirement system as State employees.*" (Emphasis added).

As soon as this Act became effective the Authority required its employees to become members of the system. Jacobs and Ewing acceded to the mandate and enrolled.

Under PERS retirement for age is regulated by *N. J. S. A.* 43 :15*A*-47, which says:

"Retirement from service shall be as follows:
a. A member who shall have reached 60 years of age may retire from service by filing with the board of trustees a written statement, duly attested, stating at which time subsequent to the execution and filing thereof he desires to be retired. The board of trustees shall retire him at the time specified or at such other time within 30 days after the date so specified as the board finds advisable.

---

[1] By 1966 amendment this provision was broadened and now says: "Notwithstanding any other law to the contrary all other persons accepting employment in the service of the State shall be required to enroll in the retirement system as a condition of their employment, regardless of age." *L.* 1966, *c.* 217, § 2, *p.* 1053; *N. J. S. A.* 43 :15*A*-7 (d).

[2] At the same time employees of the New Jersey Turnpike Authority, Palisades Interstate Park Commission, Interstate Sanitation Commission, and the Delaware River Joint Toll Bridge Commission (with certain exceptions) were included. *L.* 1955, *c.* 261, § 19, *p.* 977. Later those of the Delaware River Basin Commission were brought in. *L.* 1963, *c.* 19, § 1, *p.* 41. These agencies have employment power substantially the same as the New Jersey State Highway Authority.

"b.  A member who shall have reached 70 years of age shall be retired by the board for service forthwith, or at such time within 90 days thereafter as it deems advisable, except that an employee reaching 70 years of age may be continued in service from time to time upon written notice to the board of trustees by the head of the department where the employee is employed." *N. J. S. A.* 43:15A–47.

Thus a member may retire voluntarily between ages 60 and 70 years, but on reaching 70 years he "shall be retired forthwith" by the board of trustees of the system, subject to the exception which is not material here. And he must be given the retirement allowance specified by *N. J. S. A.* 43:15A–48.

The general administration and responsibility for the proper operation of PERS and for making effective the provisions of the Act are vested in the board of trustees. *N. J. S. A.* 43:15A–17. The board is required to appoint an actuary to be its technical adviser on matters regarding the operation of the fund created by the provision of the Act. *N. J. S. A.* 43:15A–18. The actuary's duty (among others) is to make an actuarial investigation into the mortality, service and compensation or salary experience of the members of the pension system as well as its assets and liabilities. On the basis of such study the board of trustees must adopt for the retirement system such mortality, service and other tables as are deemed necessary, certify the rates of deduction from compensation computed to be necessary to pay the annuities authorized by the Act, and certify the rates of contribution, expressed as a proportion of the compensation of members, which shall be made by the State to the contingent reserve fund. *N. J. S. A.* 43:15A–19.

Thus it appears that the pension benefits provided under PERS are funded by joint contributions of the employees covered and their employers. The employees contribute at a percentage rate of their compensation which remains fixed during their active service. The remainder of the cost of the benefits is met by employer contributions determined and certified by the system's actuary. The employers' contribution as calculated by the actuary is expressed as a proportion of the compensation paid to all employees, which if paid monthly

during the entire prospective service of the employees will be sufficient to provide for the pension reserves required at the time of discontinuance of active service. See *N. J. S. A.* 43:15*A*–24. Obviously the rate of contribution of the employer must be based upon certain actuarial assumptions. At the present time a major assumption is that *all* covered employees may retire voluntarily between age 60 and age 70, and that they must retire at age 70 (with some limited exceptions). The Attorney General has furnished information to the effect that the present rates of retirement for service assume that over 70% of such employees who attain the minimum retirement age of 60 and retire thereafter will do so after age 65, with almost 50% of the total expected to remain in service until age 70. It follows that any modification of the conditions for retirement which produces a change in the level or incidence of pension payments affects the employers' costs. For example, if any substantial group of employees were subjected to a mandatory retirement age inconsistent or incompatible with the statutory standard, *N. J. S. A.* 43:15*A*–47(a) and (b), *i. e.,* voluntary between age 60 and 70 years and mandatory at age 70, the actuarial integrity of the system would suffer an unavoidable trauma, which could only be remedied by substantial additional contributions to the fund by *all* covered employers.

As noted above, when the Authority became a participant in the pension system and its employees such as Jacobs and Ewing were required to become members, the qualifying statute specified that they were subject to the "same contribution and benefit provisions of the retirement system as State employees." *N. J. S. A.* 43:15*A*–73 *supra.* The meaning of the language is inescapable. The pension benefits being the same, the employees' rate of contribution, namely a fixed percentage of their wages, throughout the period of service, was based upon the same actuarial assumptions as all other covered State employees. Also the Authority's rate of contribution was predicated upon the actuarial assumption arising from the age retirement pro-

visions uniformly applicable to all participating employers. Thus, it must be concluded that when the Authority joined the system it understood and accepted the statutory prescription that its employees had the option of retiring between ages 60 and 70 years and that they must retire at age 70. It was not until 10 years later that the rule requiring its employees to retire at age 65 was adopted.

██ The Authority contends that its broad statutory power to hire, promote and discharge its employees without regard for the *Civil Service Act, N. J. S. A.* 11:1–1 *et seq.,* empowers it to regulate their retirement age, at least to the extent of enforced retirement at age 65. The claim is that as an autonomous agency vested with such broad control over its employees, it ought not be regarded as subject to the general age retirement provisions of the Public Employees Retirement System unless it chooses to accept them. A further argument is that if none of its employees can acquire tenure, and therefore all of them are subject to discharge without cause or hearing, it ought to be deemed to have the subsidiary power of adopting a mandatory retirement age for them. But tenure and pension rights are different matters and in the employment relations context presented here, obviously they were dealt with separately by the Legislature. When the Authority was established and authorization conferred to appoint employees, it must be presumed that the Legislature was familiar with its own enactments relating to and controlling public employment generally. *State v. Federanko,* 26 *N. J.* 119, 129 (1958). So when cognate laws are passed, a presumption of at least equal force is present that they were intended to become part of a consistent whole unless they or parts of them are expressly or impliedly incompatible. When the Authority was created, the lawmakers knew the Civil Service Act was designed as an overall measure to give tenure generally to public employees of the State. Plainly they wished to exclude its employees from the acquisition of tenure. So by the use of express language they did so.

Within a short time after the inception of the Authority, the Legislature decided that its employees should have the same pension rights as other State employees. This was done expressly by the 1955 Act, *N. J. S. A.* 43:15A–73, above referred to, which gave the Authority the privilege of joining the pension system and directed the board of trustees of PERS to enroll its employees upon acceptance of the offer. The option was given to the Authority alone. Acceptance by it imposed a mandate upon its employees to join. And their membership was made "subject to the same contribution and benefit provisions of the retirement system as State employees." This unqualified language must be liberally construed to accomplish the fullest purpose consistent with the pension rights enjoyed by other covered State employees. When it was used, the Legislature was aware that Authority employees had no tenure rights and could be discharged without good cause or hearing. It knew also that on becoming members of the pension system, at their option they could retire between 60 and 70 years of age, and had to retire at age 70. If the legislators had any intention of authorizing adoption of a separate retirement rule for them, it must be assumed they would have done so expressly as they did with respect to avoidance of tenure. It follows therefore that the general age retirement provision was to apply in the absence of unavoidably inconsistent language. In this situation, particularly since the legislative policy is clearly to provide pensions for public employees, a court should not find exclusion unless the two enactments cannot stand together reasonably. See *Dept. of Labor and Industry v. Cruz,* 45 *N. J.* 372, 380 (1965). There is no such incompatible language either in the Authority creating act or in *N. J. S. A.* 43:15A–73 which brought its employees into the pension system.

When the Authority became a participant in PERS its rate of contribution was computed actuarily the same as the other employer participants, *i. e.,* on the basis of voluntary retirement of employees between 60 and 70 years of age and their mandatory retirement at age 70. Its continuing contributions

to the growth and sufficiency of the fund to satisfy the pension benefits of all covered employees, not only its own, would be far from adequate if all of its employees are required to retire at age 65 years.[3]

In view of the distortion of the actuarial assumptions that would result from the Authority's mandatory age 65 rule as well as the resulting insufficiency of its contributions to meet the demands imposed by such a rule, the unfairness of subjecting the fund to such demands becomes clear, particularly since the fund was designed to provide benefits on the same basis for all covered employees. Therefore such a rule should not be recognized unless authorized expressly or by unavoidable implication of the statute. See, *Div. of Pensions v. Lindeman,* 103 *N. J. Super.* 375, 379–380 (*Ch. Div.*), affirmed 53 *N. J.* 70 (1968); *Bd. of Trustees, etc. v. Bd. of Freeholders of Warren Co.,* 87 *N. J. Super.* 187, 192–194 (*Law Div.* 1965), affirmed 47 *N. J.* 132 (1966). We find no language in the Authority creating act of sufficient potency to support its claim of power to enforce retirement at age 65. The grant of employment autonomy with respect to termination of service was limited to discharge free of the tenure requirements of the Civil Service Act. Retirement of its employees on pension was left within the control of PERS. In our judgment if the Legislature intended otherwise it would have said so. In instances where the lawmakers intended to sanction a younger retirement age than that specified in PERS, language expressly authorizing such age appears in the enabling legislation, and ordinarily an independent pension fund is involved. See, *e. g.,* state police, *N. J. S. A.* 53:5–1, 2; county traffic police, *N. J. S. A.* 43:10–30, 34; policemen and firemen, *N. J. S. A.* 43:16–1, 43:16A–5; prison officers, *N. J. S. A.* 43:7–7.

---

[3] If the Highway Authority and the other agencies referred to in footnote 2 could lawfully adopt a mandatory age 65 retirement rule for their employees, undoubtedly a very serious blow would be dealt to the sufficiency of PERS to meet the overall pension demands.

It is clear from a study of the PERS and other related independent statutes that the Legislature has been moving toward a uniform scheme for the pensioning of all public employees in State and local government service. The general specification of voluntary and mandatory age requirements in *N. J. S. A.* 43:15A–47(a) and (b) is a major element of the system. Since the actuarial soundness of the fund created to pay the pensions centers around those age requirements, they should be adhered to scrupulously in the absence of compelling statutory direction to the contrary.

For the reasons stated we hold that the age 65 mandatory retirement rule established by the Authority for its employees is contrary to *N. J. S. A.* 43:15A–47 (a) and (b) and therefore void. In our view, to hold otherwise on the record before us would be to subvert the beneficent aim of the Legislature with respect to pensions. Accordingly, the Authority is directed to reinstate Jacobs and Ewing to their respective positions, the former as of April 15, 1966, and the latter as of October 31, 1967.

On reinstatement Jacobs and Ewing are entitled to back pay from the date of their forced retirement to the date of our judgment subject to certain equities favoring the Authority:

(1) Jacobs was retired as of April 15, 1966. *R. R.* 1:3–1(b) required the institution of proceedings to attack the Authority order within 45 days thereafter or by May 31, 1966. This suit was not filed until August 10, 1967, 14 months and nine days after the expiration of the 45-day period. In order to decide the important public question involved, the Appellate Division in its discretion decided to accept the explanation for the delay and not to direct a dismissal.

Ewing was retired on October 31, 1967 and intervened in the action on leave from this Court on December 10, 1968, 13 months and nine days later, 11 months and 24 days after expiration of the 45-day period.

We have decided not to interfere with the Appellate Division's decision to retain the appeal in the Jacobs matter,

and we feel that the same ruling should apply to the intervenor Ewing's case as well. However, justice requires that back pay be denied during the period of delay in each case. Both men were paid their pension from the dates of their respective retirements. But we believe they should not be deprived of *both* back pay and pensions for the period of delay in seeking the aid of the courts. Therefore, subject to a qualification to be stated, we feel the Authority should be required to reimburse the PERS for the pension paid to Jacobs for 14 months and nine days, the suit delay period. The qualification is that if Jacobs was employed elsewhere during that period, his earnings should be used to reimburse the pension fund, the Authority making up the deficiency, if any.

In Ewing's case the Authority should reimburse the PERS for the pension paid to him for 11 months and 24 days representing his suit delay period, subject to the same qualification. If he was employed elsewhere during that period, his earnings should be used to reimburse the pension fund, the Authority making up the deficiency, if any. Beyond reimbursement of PERS to the extent described, the Authority has no back wage obligation to either Jacobs or Ewing for the suit delay period.

(2) Except for 14 months and nine days the Authority is liable to Jacobs for back wages. The same is true with respect to Ewing except for 11 months and 24 days. The total back wages in each case is subject to mitigation by the employment earnings, if any, each man made for the first 45 days of retirement and thereafter from the date he instituted these proceedings (Jacobs, August 10, 1967; Ewing, December 10, 1968) down to the date of payment under our judgment herein. See, *Mason v. Civil Service Commission and City of Trenton,* 51 *N. J.* 115 (1968); *Mastrobattista v. Essex County Park Comm'n,* 46 *N. J.* 138 (1965). Out of the sum of back wages recovered by each man he is obliged to return *to PERS* the pension payments received for the period described, *i. e.,* the first 45 days of retirement, and from August

10, 1967 to date of last payment of pension for Jacobs, and from December 10, 1967 to date of last payment of pension for Ewing.

The judgment of the Appellate Division is reversed and the cause is remanded for disposition in accordance with this opinion.

*For reversal and remandment*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.