TOWNSHIP OF MAHWAH, JOANNE MAKELY, FRANK P. KRAUS AND NEILAN BOMAN, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, v. BERGEN COUNTY BOARD OF TAXATION, CRESSKILL BOROUGH, CLOSTER BOROUGH, FORT LEE BOROUGH, DEMAREST BOROUGH, LITTLE FERRY BOROUGH, EUGENE P. BARDEN, ELIAS M. ELIASOF, CHARLES WARK, EDWARD W. JANSEN, AND NICHOLAS CORBISCELLO, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND FAIR LAWN BOROUGH, ALPINE BOROUGH, TETERBORO TOWNSHIP, ALLENDALE BOROUGH, HACKENSACK CITY, ENGLEWOOD CLIFFS BOROUGH, RIDGEFIELD PARK BOROUGH, LODI BOROUGH, CARLSTADT BOROUGH, AND FAIRVIEW BOROUGH, DEFENDANTS, AND TEANECK TOWNSHIP AND WERNER H. SCHMID, DEFENDANTS-RESPONDENTS.

Argued October 10, 1984—Decided January 14, 1985.

*Brian T. Campion* argued the cause for appellants and cross-respondents (*Breslin and Breslin,* attorneys; *E. Carter Corriston,* of counsel).

*Anthony D. Andora* argued the cause for respondents and cross-appellants Cresskill Borough, et al. (*Andora, Palmisano, DeCotiis & Harris,* attorneys; *Anthony D. Andora* and *Jonathan N. Harris,* on the briefs).

*Jacob Schneider* argued the cause for respondents Township of Teaneck, et al. (*Schneider, Balt & Ciancia,* attorneys; *Peter D. Ciancia,* on the brief).

*Harry Haushalter,* Deputy Attorney General, argued the cause for respondent and cross-appellant Bergen County Board of Taxation (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Joseph S. DiMaria* submitted a letter in lieu of brief on behalf of amicus curiae Borough of Paramus.

*Stuart R. Koenig* submitted a letter in lieu of brief on behalf of *amicus curiae* Township of Cedar Grove (*Stickel & Koenig,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Like the appeal in *Newark Superior Officers Association, et al. v. The City of Newark, et al., and State of New Jersey, Department of Civil Service, et al.,* 98 *N.J.* 212 (1984), which we are also deciding today, this case presents the question of whether a statute that relies on population for its classification is special legislation enacted in violation of N.J. Const. (1947), Art. IV, § VII, ¶ 9. The statute in issue is *N.J.S.A.* 54:4–5, *L.* 1922, *c.* 130 (rebate statute), which during the tax years 1974 to 1980 provided a rebate of a portion of a municipality's share of county taxes if the municipality were located in a first-class county with a population in excess of 800,000, and had within its borders 200 acres or more of land used and occupied by a state or county institution. In 1980, the Legislature supplemented this statute by the enactment of *N.J.S.A.* 54:4–5.2 (*L.* 1980, *c.* 1187), approved September 22, 1980, which foreclosed any municipality that had not received the rebate for any year prior to the effective date of this act from receiving the rebate for any prior or future tax year.

The trial court and the Appellate Division held both statutes to be unconstitutional special legislation.

## I

The Township of Mahwah (Mahwah) is a municipality in Bergen County. For the tax years in issue, 1974 to 1980, Bergen and Essex Counties were the only first-class counties in the state with populations exceeding 800,000. In each of these years, Essex and Bergen Counties had the highest county budgets and the highest total general property taxes.

Located in Mahwah are Ramapo College owned by the State of New Jersey Department of Higher Education, which consists of approximately 370 acres, and the Bergen County Police and Fire Academy, a county facility consisting of approximately 26 acres.

For each of the years 1972 through 1979, Mahwah filed a petition with the Bergen County Board of Taxation (County Board) requesting a rebate of ½ of its county taxes pursuant to *N.J.S.A.* 54:4-5. For the year 1980 Mahwah filed a complaint directly with the Tax Court seeking payment of a rebate or alternatively a declaration of a tax-exempt status.

The County Board issued judgments for the years 1972 through 1979 denying the relief requested. Mahwah appealed these judgments to the State Division of Tax Appeals, which transferred the appeals to the Tax Court.

Prior to trial in the Tax Court, the court granted a motion made by the New Jersey Attorney General on behalf of the County Board to dismiss the complaints for the years 1972 and 1973 as being filed out of time. In addition to Mahwah and the County Board, permission to intervene was granted to other taxing districts in Bergen County [1] as well as to several individ-

---

[1] Boroughs of Cresskill, Closter, Fort Lee, Demarest, Little Ferry, Fair Lawn, Teaneck Township, Alpine, Teterboro Township, Allendale, Englewood Cliffs, Ridgefield Park, Lodi, Carlstadt, Fairview and Hackensack.

ual residents of Mahwah and the other Bergen County municipalities.

Permission was also granted to Cedar Grove to intervene as *amicus curiae.* Rebates under the rebate statute had been paid to Cedar Grove, located in Essex County, for the years 1923 through 1980, and to Secaucus, located in Hudson County, for the years 1943 through 1965.

There are seventy taxing districts in Bergen County. The cost of the Bergen County budget is annually apportioned among the seventy taxing districts in the County through the mechanism of the table of aggregates. *N.J.S.A.* 54:4–49 to –52. Pursuant to this procedure, the County Board, in annually determining the tax rates under the Local Property Tax Law, *N.J.S.A.* 54:4–1 to –136, includes in each municipality tax levy sufficient monies to cover that municipality's apportioned share of county taxes. According to Dante Leodori, Tax Administrator of the Bergen County Board, if Mahwah were to receive the rebates it claims under the Rebate Statute for the tax years 1974 to 1980, it would be entitled to $3,807,877.97. This rebate would be credited against Mahwah's current and future years' apportioned share of county taxes. The granting of such a rebate would necessitate that the other sixty-nine municipalities in Bergen County proportionately assume the additional costs of the County budget resulting from the rebate. It is estimated that if all of Mahwah's rebates were granted, the additional tax burden to the other residents of Bergen County would be less than $1 per year per person.

In the tax years 1978 through 1980, Mahwah received from the State payments in lieu of taxes pursuant to *N.J.S.A.* 54:4–2.-2a to –2.2k for having located within its borders Ramapo College. These payments totaled $73,777.77 and $75,670.28, for 1978 and 1979, respectively.

The Tax Court held both *N.J.S.A.* 54:4–5 and its supplement, *N.J.S.A.* 54:4–5.2, to be unconstitutional as special legislation. 3 *N.J.Tax* 513 (1981). Accordingly, all of Mahwah's claims

were dismissed. In addition, the Tax Court held that for the years 1974 through 1977 Mahwah had established that 200 acres of its land were used and occupied by state and county institutions within the meaning of *N.J.S.A.* 54:4–5, but that as a result of the payments-in-lieu-of-taxes statute, *N.J.S.A.* 54:4–2.-2a, for the tax years 1978 through 1980, Mahwah did not possess the necessary acreage to qualify under the rebate statute.

The judgment of the Tax Court was affirmed by the Appellate Division "for the reasons stated in the opinion of Judge Evers. 3 *N.J.Tax* 513 (1981). *See also Newark Superior Officers Ass'n v. Newark,* 187 *N.J.Super.* 390 (App.Div.1982)." *Township of Mahwah, et al. v. Bergen County Board of Taxation,* 190 *N.J.Super.* 84 (1983).

Mahwah appealed to this Court as of right pursuant to Rule 2:2–1(a)(1), challenging the Appellate Division judgment that *N.J.S.A.* 54:4–5 was special legislation and that Mahwah was not qualified for the rebate for the years 1978 through 1980 as a result of the application of *N.J.S.A.* 54:4–2.2a. The Attorney General, on behalf of the Board, filed a cross-appeal as of right pursuant to Rule 2:2–1(a)(1), challenging the Appellate Division's judgment that *N.J.S.A.* 54:4–5.2 was invalid. The Borough of Closter and the other intervening Bergen County taxing districts filed a petition for certification and a notice of cross-appeal with this Court seeking review of the holdings that *N.J.S.A.* 54:4–5.2 was invalid and that Mahwah met the acreage requirements of the statute for the tax years in question. We granted the petition for certification on May 16, 1984, 97 *N.J.* 595 (1984).

## II

*N.J.S.A.* 54:4–5 in its original form became law in 1922 and provided a rebate of one-half of the county taxes to any taxing district in a county of the first class in which there was located

a state or county institution occupying 200 or more acres of land.

The act's purpose was clearly stated by the Legislature:

This bill is proposed to correct an injustice to the Township of Cedar Grove, wherein the Overbrook Hospital is situated. The township is compelled to furnish tuition to the children of the various officials and attendants employed there, and is also compelled to record the vital statistics and to furnish protection to the inhabitants of said hospital, *without receiving a dollar in return.* [Statement 3, accompanying P.L.1918, p. 8471; emphasis added.]

Thus, the Legislature originally enacted *N.J.S.A.* 54:4–5 to prevent the inequity imposed upon Cedar Grove, which had to provide municipal services to Overbrook Hospital (which is the county psychiatric hospital and is now called Essex County Hospital Center) and its employees without receiving any corresponding tax benefit. As we have previously stated, the Legislature's purpose in passing the act was "to compensate some municipalities for revenues they would otherwise receive if the property had not been exempt from taxation, a condition which arose by virtue of public ownership and use." *Bergen County v. Paramus,* 79 *N.J.* 302, 309 (1979).

*N.J.S.A.* 54:4–5 was amended on several occasions. First, by *L.*1928, *c.* 176, ¶ 1, which provided that municipalities within counties of the first class that have within their boundaries county or state institutions occupying more than 400 acres of land would receive a rebate of three-fourths of the municipality's share of county taxes.

In *L.*1932, *c.* 128 the Legislature limited the definition of institutions to those institutions "other than park commission, or lands owned or occupied by any park commission." No sponsor's statement is available for this amendment. However, as indicated above, the purpose of the original bill was to provide relief for municipalities in counties that were burdened in various ways by the maintenance of county or state institutions within their boundaries. In contrast, the inclusion of a park commission or lands owned or occupied by any park commission would not constitute a similar burden on the host

municipality. Whereas the existence of Overbrook Hospital in Cedar Grove required that Cedar Grove furnish municipal services (police, fire, etc.) as well as tuition to the children of the various officials and attendants employed there, *see Sponsor's Statement* to *L.*1922, *c.* 130, *supra*, vacant land held by a park commission would not result in similar financial burdens to the municipality. Therefore, the Legislature's limitation of the definition of institutions furthers the original purpose of *N.J. S.A.* 54:4–5.

Accordingly, prior to February 21, 1969, the rebate statute applied to any county of the first class and provided tax relief to municipalities within such a county that met the statutory criteria. First class counties are defined as those counties that have a population in excess of 600,000. *N.J.S.A.* 40A:6–1.

In 1968 the statute was amended to limit the rebate to municipalities located in counties of the first class with a population over 800,000. *L.*1968, *c.* 467. As a result of this amendment, Hudson County was no longer a qualifying county. However, the 1970 census revealed that Bergen County, a first class county, had a population in excess of 800,000. Therefore, Bergen and Essex were the only two counties qualifying under the statute.

During the tax years in issue, *N.J.S.A.* 54:4–5 provided that [a] taxing district in a county of the first class having in excess of 800,000 population in which there has been located a State or county institution other than a park commission or lands owned or occupied by a park commission occupying more than 200 acres and not in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county treasurer a sum equal to ½ of the county tax rate applied to the entire amount of ratables remaining subject to taxation. A taxing district in such a county of the first class in which there has been located a State or county institution other than a park commission or lands owned or occupied by a park commission occupying in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county treasurer a sum equal to ¾ of the county tax rate applied to the entire amount of ratables remaining subject to taxation.

*N.J.S.A.* 54:4–5 was amended again by the enactment of *N.J.S.A.* 54:4–5.1 (*L.*1980, *c.* 24) to provide that only non-parkland properties could be considered in determining the required

acreage. In 1980, nine municipalities in Essex County maintained parkland that exceeded 200 acres. Essex County, because of a change in the form of its government, directly took ownership of parkland, which had previously been owned by a park commission. Since the literal language of *N.J.S.A.* 54:4–5 disqualified only parkland owned by a park commission from satisfying the acreage standard, the Legislature amended the statute to resolve an ambiguity and preclude any parkland, regardless of the form of ownership, from constituting qualifying acreage under the statute. *See L.*1980, *c.* 24. As a result of this amendment, Cedar Grove became the only municipality in Essex County that met the criteria of the rebate statute.

In 1980, *N.J.S.A.* 54:4–5 was further supplemented by the enactment of *N.J.S.A.* 54:4–5.2 (*L.*1980, *c.* 118):

> No taxing district which has not actually received a remission or rebate of county taxes pursuant to R.S. 54:4–5 for any full tax year occurring prior to the effective date of this act, shall receive a rebate or remission under that section for the current tax year or any other tax year whether occupying prior to or after the effective date of this act. Nothing contained in this act shall affect any remission or rebate of county taxes to be received pursuant to that section by any taxing district which actually received a remission or rebate for a full tax year occurring prior to the effective date of this act.

This supplement provided that a municipality, which had previously not been a recipient of the rebate, was no longer eligible for the rebate, while a municipality, which had previously qualified for the rebate, was not to be affected by this supplement as long as it continued to meet the qualifications of *N.J.S.A.* 54:4–5. Since no Bergen County municipality had received a rebate of county taxes, the enactment of *N.J.S.A.* 54:4–5.2 precluded Bergen County municipalities from qualifying for the rebate. The elimination of Secaucus by Hudson County's failure to meet the population requirement meant that Cedar Grove was the only municipality qualified to receive the rebate.

After the release of the Tax Court opinion in this case, the Legislature, in direct response to that decision, repealed both *N.J.S.A.* 54:4–5 and its supplement, *N.J.S.A.* 54:4–5.2. It sub-

stituted a general statute that applies to any taxing district and expresses the land size restriction in percentage rather than acreage terms. *L.*1982, *c.* 36; *N.J.S.A.* 54:4–5a. As stated in the Senate County and Municipal Government Committee Statement to *N.J.S.A.* 54:4–5a,

> This legislation would not be confined to counties of any particular population size or class. However, the land area restrictions in the bill are such that only Cedar Grove in Essex county would qualify. Cedar Grove has been receiving a rebate of county taxes since 1923.

The statute phases out the rebate payments and terminates in its entirety in 1987.[2]

### III

Before we reach the question of the constitutionality of the statute, we first address the issue of whether Mahwah has met the acreage requirements of the statute.

The Borough of Cresskill *et al.* in their petition for certification allege that for the tax years in issue Mahwah did not have 200 acres of property located within its borders that was "used and occupied" by State and county institutions within the meaning of *N.J.S.A.* 54:4–5.

In *Borough of Paramus v. Capello,* 66 *N.J.* 1, 4 (1974), we held that the word "occupy" as used in *N.J.S.A.* 54:4–5 "means

---

[2]Any taxing district in which there has been located a county institution, other than an educational institution or park lands, regardless of whether such lands are owned and occupied by a park commission or by any other department, division, agency or instrumentality of the county government, which occupies more than *200* acres, and which constitute at least *5%* of the total land area of the taxing district, shall have remitted or rebated by the county treasurer a sum equal to a percentage of the county tax rate applied to the entire amount of ratables remaining subject to taxation according to the following schedule:

| | | | |
|---|---|---|---|
| 1982 | 45% | 1986 | 15% |
| 1983 | 40% | 1987 and thereafter | 0% |
| 1984 | 30% | | |
| 1985 | 15% | | |

[*L.*1982, *c.* 36, § 1.]

something more than mere ownership of the land and connotes actual governmental use." In *Bergen County v. Paramus Borough, supra,* 79 *N.J.* at 308, we held that such use must be reflected in "a present intent to devote the property to a public use within a reasonable length of time."

After an exhaustive and extremely detailed analysis of the use of the Mahwah Township property for the years 1974 to 1979, particularly by Ramapo College, the Tax Court concluded that at least 200 acres of property located in Mahwah were "used and occupied" during those years by state and county institutions within the meaning of *N.J.S.A.* 54:4-5. The Appellate Division affirmed.

We hold that the record below supports the lower court's holding that Mahwah satisfied the acreage requirement of the statute for the years 1974 through 1977. However, the Tax Court held that Mahwah did not have the requisite acreage for the years 1978 through 1980 because of the application of *N.J.S.A.* 54:4-2.2a to -2.2k. Specifically, the Tax Court held that

> [T]he clear language of this provision [*N.J.S.A.* 54:4-2.2b] indicated that the sole relief accorded to municipalities burdened with state property within its borders is payment in lieu of taxation pursuant to *N.J.S.A.* 54:4-2.2a *et seq.* Accordingly, defendant's motion is granted with respect to the years 1978, 1979 and 1980 and Mahwah's claims will accordingly be dismissed. [3 *N.J.Tax* at 526.]

The Appellate Division affirmed this holding, which we now reverse.

■ The predecessor of *N.J.S.A.* 54:4-2.2a to -2.2k, the payments in lieu of taxation act, *L.*1977, *c.* 272, was *N.J.S.A.* 54:4-2.1 and its companion statute *N.J.S.A.* 54:4-2.2. These two latter statutes first appeared as the law of this State in 1935. By 1935, the rebate statute under consideration herein had already been in effect for thirteen years. The Legislature is presumed to have been aware of existing legislation at the time it adopted *N.J.S.A.* 54:4-2.2a. *See Jacobs v. N.J. State Highway Authority,* 54 *N.J.* 393 (1969).

The 1935 in-lieu payments statute provided for payment of taxes by the State on State-owned properties. County-owned property was never included in the original statute, nor is it considered in the current version found at *N.J.S.A.* 54:4–2.2a. The changes made from the time of the original statute until it achieved its current form do not in any way affect the legislative determination in 1935 that the in-lieu payments statute, requiring payments in lieu of taxes from the State treasury, was to co-exist with the rebate act that had been enacted in 1922, requiring rebates of county taxes to be paid to the municipality by the county treasurer.

■ The Tax Court erred in its determination that State-owned property cannot be considered in the calculation under *N.J.S.A.* 54:4–5 for a county tax rebate. The court relied on *N.J.S.A.* 54:4–2.2b, which provides:

Notwithstanding the provisions of any other law and to compensate municipalities for the impact upon local government cost of local services to state property, such property shall be assessed and subject to an in lieu tax payment provided in this act.

This provision clearly indicates that the in-lieu payments statute and the rebate statute can co-exist. This provision does not indicate that State property is excluded from the county tax rebate calculation. Rather, as stated in the statute, the in-lieu payments are to be made "[n]otwithstanding the provisions of any other law...." There is nothing in this language to support the conclusion of the Tax Court.

Clearly the law does not contain an express repealer of the rebate act. In fact, the rebate act was amended by the Legislature on two occasions subsequent to the adoption of the current in-lieu payments statutes. *See L.*1980, *c.* 24; *L.*1980, *c.* 118.

■ Nor are any of the indicia of an implied repealer present. *See In re Application of Saddle River,* 71 *N.J.* 14, 27 (1976); 1A *Sutherland, Statutes and Statutory Construction,* § 23.11 at 235 (4th ed. 1972). A repeal by implication requires clear and compelling evidence of the legislative intent, and such intent must be free from reasonable doubt. *State v. Des Marets,* 92

*N.J.* 62, 93 (1983) (Handler, J., dissenting in part and concurring in part); *State v. Reed,* 34 *N.J.* 554, 561 (1961); *Swede v. Clifton,* 22 *N.J.* 303, 317 (1956).

■ Every reasonable construction should be applied to avoid a finding of implied repealer. *State v. Stratis Commercial Corporation,* 165 *N.J.Super.* 158, 161 (App.Div.1979). There is a strong presumption in the law against implied repealers. *Brewer v. Porch,* 53 *N.J.* 167, 173 (1969). That the in-lieu payments statute does not contain an express repealer of the rebate statute, that the rebate statute has been amended by the Legislature twice since the in-lieu payments act became effective, and that the state property provisions were never omitted from the rebate act by the Legislature, all evidence the Legislature's intention that the two statutes should co-exist.

Furthermore, the two statutes have different definitions of state property. *N.J.S.A.* 54:2–2a, the in-lieu payments act, defines "State property" as follows:

"State property" means land and improvements owned by the State and includes but shall not be limited to State offices, hospitals, institutions, schools, colleges, universities, garages, inspection stations, warehouses, barracks and armories together with abutting vacant land held for future development for the same purposes. State property shall not include that used or held for future use for highway, bridge or tunnel purposes or property which is qualified under State law for any other State payment in lieu of taxes. [*L.*1977, *c.* 272, § 1.]

In contrast, *N.J.S.A.* 54:4–5, the rebate act, applies to "a State or county institution other than a park commission or lands owned or occupied by a park commission occupying more than 200 acres...." This latter definition includes a requirement of state ownership and occupancy, whereas there is no occupancy requirement under the in-lieu payments act. *Rutgers v. Piscataway Tp.,* 1 *N.J.Tax* 164, 169 (1980). Dealing as they do, therefore, with two separate classes of State-owned property, the statutes can co-exist.

We conclude therefore that *N.J.S.A.* 54:4–2.2a, the in-lieu payments act, and *N.J.S.A.* 54:4–5, the rebate act, co-exist as independent expressions of the intent of the Legislature and

payments made under *N.J.S.A.* 54:4–2.2a will not be found to preclude a rebate under 54:4–5. Accordingly, we hold that Mahwah had the requisite acreage for the years 1978 through 1980 to qualify under *N.J.S.A.* 54:4–5.

IV

Article IV, § VII, ¶ 9 of the New Jersey Constitution provides:

9. The Legislature shall not pass any private, special or local laws.

The Constitution permits special laws under certain conditions and restrictions, none of which are satisfied here. *See* Art. IV, § VII, ¶ 7; Art. IV, § VII, ¶ 8; Art. IV, § VII, ¶ 10.

In *Newark Superior Officers Ass'n, et al. v. The City of Newark, et al. and State of New Jersey, Dep't of Civil Service, et al.,* 98 *N.J.* 212 (1984), which we also decide today, we set forth the principles applicable to determining whether a statute is unconstitutional as special legislation. *Id.* at 222–23. First, we affirmed the principle that a statute is presumed to be constitutional and it will not be declared void unless the statute is clearly repugnant to the Constitution. *Paul Kimball Hosp. v. Brick Township,* 86 *N.J.* 429, 446–47 (1981); *Brunetti v. New Milford,* 68 *N.J.* 576, 599 (1975); *Harvey v. Essex County Bd. of Freeholders,* 30 *N.J.* 381, 388 (1959).

Although courts always recognize a strong presumption of constitutionality, we stated in *In re Loch Arbour,* 25 *N.J.* 258 (1957), that where, as here, a statute has been in effect for several years,

[a]*dded force is given to these basic concepts by the further policy of our law not to invalidate a statute which has been in force without a substantial challenge for many years,* unless its unconstitutionality is obvious. *Brown's Estate v. Town of Union,* 62 *N.J.L.* 142 (Sup.Ct.1898); *O'Banner v. Pendlebury,* 107 *N.J.L.* 245, 247 (E. & A.1931); *Gibraltar Factors Corp. v. Slapo,* 23 *N.J.* 459, 463 (1957). [*Id.* at 264–65; emphasis added.]

Unlike the statute in issue in *Newark, supra,* which was enacted in 1979, *N.J.S.A.* 54:4–5 has been the law since 1922. For over sixty years Cedar Grove has received rebates under the statute, as did Secaucus, located in Hudson County, for the years 1943 to 1965. During that period of time, the Legislature

continually reviewed and examined the statute, amending it numerous times from 1928 to 1980, so that it would conform to its original purpose. The length of time *N.J.S.A.* 54:4–5 has been in effect reinforces and buttresses the general presumption of constitutionality that attends every statute. *Vornado Inc. v. Hyland,* 77 *N.J.* 347, 352 (1978).

The second principle enunciated in *Newark* as to whether a statute is unconstitutional special legislation is that the burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision. *Piscataway Township Bd. of Educ. v. Caffierre,* 86 *N.J.* 308, 318 (1981); *Jamouneau v. Horner,* 16 *N.J.* 500, 515 (1954); *In re Freygang,* 46 *N.J.Super.* 14 (App.Div.), aff'd, 25 *N.J.* 357 (1957).

The third principle, one that we have long held, is that in deciding whether an act is special or general legislation, the determining factor is what is excluded, not what is included. *Budd v. Hancock,* 6 *N.J.L.* 133 (Sup.Ct.1901). These principles have been restated numerous times by this Court, most recently in *Kimball Hosp. v. Brick Township Hosp., supra,* 86 *N.J.* at 446.

In *Newark,* we also applied the three part test that we set forth in *Vreeland v. Byrne,* 72 *N.J.* 292 (1977), to determine whether legislation constitutes special legislation. Under that test, we first consider the purpose and object of the legislation. We next apply it to the factual situation to determine whether any one thing is excluded that should be included. Lastly, we determine whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act. *Id.* at 300–01.

## V

We now apply the *Vreeland* test to the statute presented here prior to its supplement in 1980.

*N.J.S.A.* 54:4–5 reflects a legislative determination that municipalities in first class counties that maintain a state or county institution occupying more than 200 or more than 400 acres are

to receive a rebate of, respectively, ½ or ¾ of the county taxes. The specific purpose of the original rebate statute was to lessen the burden on Cedar Grove of having a county psychiatric hospital on a major portion of property within its border. More generally, by providing for the rebate of county taxes, the statute creates two effects: first, it provides a means of affording tax relief to a municipality that is burdened by the presence of a state or county institution within its borders that uses and occupies more than 200 or more than 400 acres and is exempt under the local property tax; second, it requires that the other municipalities within the county share the financial burdens for a state or county institution that serves the entire county.

By enacting the statute, the Legislature recognized the inevitable fiscal burdens that befall a municipality that supports a state or county institution within its borders that uses and occupies the requisite acres but is not subject to real property taxation. The Legislature determined that the other municipalities in the county should share part of the expenses for maintaining such an institution by proportionately picking up the costs of the rebate of the county taxes. In *Meadowlands Regional Development Agency v. State*, 63 *N.J.* 35, *cert.* den., 414 *U.S.* 991, 94 *S.Ct.* 343, 38 *L.Ed.*2d 230 (1973), we affirmed a legislative plan for development of the Meadowlands in accordance with a plan requiring intermunicipal sharing of the tax burdens. We thereby affirmed the propriety of legislation requiring the sharing of costs among constituent municipalities within a county. *See also Bonnet v. State*, 155 *N.J.Super.* 520, 529 (App.Div.), aff'd o.b., 78 *N.J.* 325 (1978), (holding that New Jersey's system of financing welfare and the judiciary through costs imposed upon the counties and met through the local property taxes raised by each constituent municipality was constitutional).

Next, in applying the *Vreeland* test, we determine whether any municipality is excluded that should be included. The act is applicable only to municipalities in first class counties that have a population in excess of 800,000. Essex and Bergen are the only first class counties that have a population in excess of

800,000. In addition to having the largest county populations in New Jersey, Essex and Bergen also have the largest county budgets and the highest total general property taxes.

Although the act is applicable only to Essex and Bergen Counties, no other similarly-situated county is excluded. There is no other county in this State that currently meets the population requirement of the act. When the statute was amended in 1968, only Essex County met its requirements. Bergen County, however, became eligible after the 1970 census disclosed that its population had increased to more than 800,-000. The populations of other counties in the State may similarly increase to more than the 800,000 required by the statute.

Moreover, if the classification is otherwise valid, it is not rendered invalid by the fact that it applies to only one city in the State. *Kimball, supra,* 86 *N.J.* at 448. We have held that a statute is not unconstitutional special legislation merely because it addresses the needs of a particular municipality or serves a particular legislative purpose. *McKenny v. Byrne,* 82 *N.J.* 304 (1980); *In re Loch Arbour, supra,* 25 *N.J.* 258.

Accordingly, the Legislature's motivation in adopting the rebate act in 1922 to ameliorate the particular hardship of Cedar Grove (*see Paramus v. Bergen County,* 2 *N.J.Tax* 515 (1981)) is not determinative of the constitutionality of the statute when, both on its face, and as revealed by the history of its subsequent effect, other municipalities could, and from time to time have, come within its scope.

The final inquiry under the *Vreeland* test is whether the act rests on a rational basis justifying the classification. We have held that "[t]he test of whether a law constitutes special legislation is essentially the same as that which determines whether it affords equal protection of the laws." *Robson v. Rodriguez,* 26 *N.J.* 517, 528 (1958); *see also Harvey v. Essex County Board of Freeholders, supra,* 30 *N.J.* at 394.

In *McKenney v. Byrne, supra,* 82 *N.J.* at 314–16, we held that in searching for a conceivable rational basis for the enact-

ment of legislation, the court is not limited to the stated purpose of the legislation, but should seek *any* conceivable rational basis. As we stated:

> Although the Legislature may have stated only one purpose, this does not foreclose the possibility that it had in mind other related reasons for its action.... Under such circumstances we should not ignore alternative rationales. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 *U.S.* 483, 488, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 572 (1955). [*Id.* 82 *N.J.* at 318.]

In *Vornado Inc. v. Hyland, supra,* 77 *N.J.* 347, we again emphasized that

> [t]he Legislature is presumed to have a valid classification in mind. Distinctions will be presumed to rest upon a rational basis if there be *any conceivable state of facts* which would afford reasonable support for them. [*Id.* at 352.]

As was true of the statute under consideration in *Newark Superior Officers, supra,* the statute being considered herein is challenged as being unconstitutional because it creates a classification based on population. In *Newark,* the classification involved a city; here, it is a county. But the principles applicable to determining whether a statute based on population classification can be supported by any conceivable statement of facts are the same. In *Newark Superior Officers,* we held that a classification based on population does not automatically render a law unconstitutional special legislation. Moreover, in that opinion we cited examples to demonstrate that the nexus between accountability and population has been frequently recognized by the Legislature and upheld by New Jersey courts.

Examples of legislation involving classifications based upon populations of municipalities or counties are as follows: *N.J. S.A.* 43:10–7 allows counties of the first class to impose in their tax levy taxes sufficient to meet the requirements of the employees' pension fund; *N.J.S.A.* 30:9–24 allows counties of the first class to establish maternity hospitals, issue bonds, and tax for the payment of those bonds; *N.J.S.A.* 40:22–14 allows first class counties to tax for the payment of salaries of county police for the regulation of traffic; *N.J.S.A.* 40A:9–117.2 relates to the appointment of uncompensated deputy sheriffs in coun-

ties having populations greater than 900,000; *N.J.S.A.* 40A:9–117.5 provides for chief warrant officers in first class counties with populations in excess of 600,000 but less than 700,000; *N.J.S.A.* 51:1–43 requires appointment of a superintendent of weights and measures in municipalities of 60,000 or over. Accordingly, under the law of the State of New Jersey population is generally accepted as a means of classification.

One of the most frequent arguments proffered when alleging that a statute whose classification is based on population is special legislation is that other municipalities that differ slightly in population should have been included. It is always arguable that a different line should have been drawn. However, to establish the unconstitutionality of a statute, it is not sufficient merely to prove a similarity among municipalities included in a statutory classification and those municipalities just above or just below the line that the Legislature has drawn. Thus, a court will not strike down an act on the ground that there is nothing to distinguish municipalities or counties slightly above or slightly below the population classification in issue.

We addressed this exact issue in *Bucino v. Malone,* 12 *N.J.* 330 (1953). There the question was the statutory distinction between municipalities with populations of 7,000 or less and those of greater population with respect to the time period during which municipalities adopting a new form of government under the Faulkner Act would be precluded from again voting on a change of government. The period of preclusion was fixed at three years for municipalities with populations of 7,000 or less, and five years as to all others. The plaintiff attacked the classification as arbitrary and therefore unconstitutionally special, having no reasonable relationship "to the necessities and proprieties of various kinds of municipal government." We sustained the validity of the statute, stating:

> The Legislature has determined that as far as this freeze period is concerned a distinction should be made between the municipalities with less than 7,000 inhabitants and those with an excess thereof. Plaintiffs have not convinced us

> that this distinction is arbitrary and without reasonable basis. A larger municipality needs a longer test period in which to study the operation and effect of its new plan. The problems of city government are naturally more complex than those of the smaller community, and it may be unwise to condemn a plan of government before it has been in effect for this longer period of time. Also there is necessarily a great amount of confusion attendant upon a change of government in the larger municipality. Such disorder should be kept at a minimum by requiring longer periods of time between changes of government. The classification is valid. [*Id.* at 347–48.]

Although it is arguable that a 7,000 population figure was too low to constitute a reasonable benchmark for distinction between "larger" municipalities and "smaller" ones for purposes of fixing a "freeze," we did not quibble over figures in light of the Legislature's express selection of a figure.

In *McCarthy v. Queen*, 76 *N.J.L.* 144 (Sup.Ct.1908), the court again sustained a distinction between cities of the first class and all others. The statute in question required that, in first class cities, the term of office of all city officers should expire with the term of the mayor who appointed them, and that their successors should be appointed by the incoming mayor. In holding the act not to be special, the court pointed out the tendency in modern legislation concerning the government of populous cities to place the power of appointment "in a single centre," and that there are many valid reasons therefor, principally that the mayor is elected by all the people and is held largely responsible for the policy of government. *Id.* at 149. The court concluded that the intent of the act was that in large cities the governing officials should be in accord with the chief executive. *Id.*

Under consideration in *Dickinson v. Freeholders of Hudson*, 71 *N.J.L.* 159 (Sup.Ct.1904), aff'd, 71 *N.J.L.* 589 (E. & A.1905), was a statute providing for financing and construction of a new courthouse, applicable only to counties of the first class. The court held the classification valid, stating:

> [I]n the act now under review, there is perceptible a reasonable relation of population to the subject-matter. It would seem that in counties of the first class, having so large a population, where the demands for the accommodation of the courts and county officers are vastly greater than in other counties of

the state, legislation might be justified requiring greater detail and providing greater safeguards than might be deemed requisite in the smaller counties. [71 *N.J.L.* at 163–64.]

In *Owens v. Fury*, 55 *N.J.L.* 1 (Sup.Ct.1892), the court reviewed a statute which provided that in cities with populations between 50,000 and 100,000 the greater part of the appointive power of common councils should be transferred to the mayor of the municipality. The population classification was attacked as rendering the statute unconstitutional special legislation. In holding the act valid, the court stated:

Almost all offices affecting the interests of a great number of persons are of a highly important character, while those that touch the affairs only of a few persons are usually insignificant. It seems undeniable that the clerkship of a large city is of much greater public concern than the clerkship of a small one. If, then, the importance of the office is to be measured by the largeness of the population in which it operates, it would seem to follow, as a direct consequence, that the method of filling such office has the same affiliation with population.... Where such [appointive] power shall reside in our municipal constitutions is, therefore, a subject for legislative determination, depending on the magnitude of the given office, and which magnitude, as we have seen, is to be tested by population. A classification by population, in this respect, is consequently, entirely proper. [*Id.* at 2–3.]

In *Owens*, the court made no effort to justify the exclusion of cities above 100,000 in population. The court sustained the legislative classification, focusing its viewpoint merely upon the distinction between cities of 50,000 to 100,000 population as contrasted with those under 50,000. *See also Freeholders of Hudson v. Clarke*, 65 *N.J.L.* 271 (E. & A.1900); *McDonald v. Board of Freeholders*, 99 *N.J.L.* 393 (E. & A.1924).

We emphasize that in population classification cases, legislative bodies may undertake the progressive resolution of problems dealing first with those aspects that are most pressing. In *N.J. Restaurant Ass'n v. Holderman*, 24 *N.J.* 295 (1957), we stated that it is not enough for a person alleging that a statute is special legislation

to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. [Citations omitted.] The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience

and expense, ... or because of "some substantial consideration of public policy or convenience or the service of the general welfare." *De Monaco v. Renton*, 18 *N.J.* 352, 360 (1955). Hence it may "stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact." *Dominion Hotel, Inc. v. State of Arizona, supra* (249 *U.S.* [265] at page 268, 39 *S.Ct.* [273] at page 274 [63 *L.Ed.* 597]) [24 *N.J.* at 300–01.]

*See also Two Guys from Harrison Inc. v. Furman*, 32 *N.J.* 199 (1960), in which Chief Justice Weintraub stated:

The reason why a Legislature may strike at an evil where it finds it *without first surveying the entire scene in which it may exist even in equal degree* is an inescapable concession to the practicalities of a complex social and economic order. The legislative process would be hamstrung if the Legislature had to explore every nook and corner before it acted. [*Id.* at 219;    emphasis added.]

*See also Piscataway Tp. Bd. of Ed., supra*, 86 *N.J.* 308, where this Court held, "A state may undertake resolution of problems one step at a time, addressing itself to the part of the problem that seems most acute. *Williamson v. Lee Optical of Oklahoma*, 348 *U.S.* 483, 489, 75 *S.Ct.* 461, 465, 99 *L.Ed.* 563, 573 (1955)." *Id.* 86 *N.J.* at 324.

## VI

As we stated in *Newark, supra*, 98 *N.J.* at 227

Ultimately, the generality or speciality of a statute becomes a question of reasonableness. There is no general rule to distinguish a reasonable from an unreasonable classification, the question being a practical one varying with the facts in each case. As stated previously, where the question of reasonableness is fairly debatable, courts will uphold the classification. The burden of showing that the classification is not reasonable is upon the party attacking the statute. If we can conceive of any reason to justify the classification, the statute will be upheld.

■ Our analysis here discloses that there is a rational basis to support the population classification of the rebate act. There is a conceivable set of facts that supports the legislation at issue. We believe that it is conceivable, and based on common sense that it is likely, that an institution in a county with a larger population will be utilized by more people than a similar institution in a smaller county. In addition, a municipality will have demands placed on it in support of a state or county institution (e.g. police, fire, ambulance, maintenance of roads,

sanitation) that would not exist in a municipality without such an institution. The expense of such demands can be more easily shared among residents in a larger county than by those in a smaller one. Simply stated, assuming two counties with equal county tax contributions—one, a county with a population greater than 800,000 and one, a county with a population less than 800,000—the burden on individual taxpayers who indirectly pay the rebate to the host community would be less per capita in the larger county than in the smaller county.

In short, it is conceivable that the greater the population in a county, the greater the number of people an institution in that county serves, and the greater the burden on the host community because of the greater demand for uncompensated services. While we might not agree that the population line should have been drawn where it has been, we submit that that determination is a legislative function subject to many considerations beyond the purview of this Court.

We recognize that the burden on a host town in a small county might be just as great as that on a town in a large county, but that the size of the small county would preclude a tax rebate under the statute. Nevertheless, we believe that, in adding the population requirement, the Legislature could rationally have presumed that an institution in a small county would be used less often and require fewer support services from the host city than would an institution in a large county. A further rationale for the statute is the presumption that the per capita cost of the rebate to the rest of the county would be smaller in a large county. We hold that such presumptions are a rational basis upon which to sustain the statute.

In conclusion, we affirm the statute's strong presumption of validity, a presumption that is strengthened by the fact that it was enacted sixty years ago and has been reviewed and amended by the Legislature frequently during that period of time.

Second, we emphasize that population is a valid classification. Courts should not quibble by making comparisons to subjects

slightly below or above the dividing line chosen by the Legislature.

Third, the possibility that some municipalities in the excluded category might merit the benefits of the act as much as or more than some of the municipalities in the included category is not determinative. That possibility is inherent in the nature of any legislative classification. If by and large, and characteristically, the subject matter within the excluded category has any rational relationship to a proper statutory objective or purpose for exclusion, the courts must sustain the classification.

Fourth, as we previously stated, there is an obvious rationale for the classification based on population. The Legislature could reasonably have assumed that counties with populations of 800,000 or over would have a greater density and intensity of use of the same area of land than counties of lesser population. The resultant burden upon the host community could have reasonably and rationally been the basis of the population classification created.

Further, it is conceivable that a major policy consideration in the formulation of this classification could have rested in the legislative contemplation of the substantially higher burden of contribution to rebates for taxpayers in smaller counties than in larger ones. In other words, rebates of equivalent dollar amounts would have to be made up by assessment of taxpayers generally throughout the county, and the proportionate financial burden of such contribution would be relatively larger on taxpayers in smaller counties than in larger counties because, as the Legislature could reasonably have assumed, the aggregate of taxable ratables in larger counties is generally greater than in smaller counties.

Accordingly, we conclude that *N.J.S.A.* 54:4–5 is not special legislation. Hence, it is constitutional and we reverse the judgment of the Appellate Division in this regard.

## VII

▇ Effective September 22, 1980, *N.J.S.A.* 54:4–5 was supplemented by the enactment of *N.J.S.A.* 54:4–5.2 (*L*.1980, *c.* 118), which provides:

> No taxing district which has not actually received a remission or rebate of county taxes pursuant to R.S. 54:4–5 for any full tax year occurring prior to the effective date of this act, shall receive a rebate or remission under that section for the current tax year or any other tax year whether occurring prior to or after the effective date of this act. Nothing contained in this act shall affect any remission or rebate of county taxes to be received pursuant to that section by any taxing district which actually received a remission or rebate for a full tax year occurring prior to the effective date of this act.

This "grandfather clause" limited the application of *N.J.S.A.* 54:4–5 to municipalities that had received a rebate under that act prior to the effective date of *N.J.S.A.* 54:4–5.2. Since no Bergen County municipality had received a rebate of county taxes, the enactment of *N.J.S.A.* 54:4–5.2 prevented Bergen County municipalities from ever qualifying for the rebate, and left Cedar Grove as the only municipality to ever qualify for the rebate. *See supra* at 277.

In *Paul Kimball Hosp. v. Brick Township Hosp.*, 86 *N.J.* 429 (1981), we held:

> Grandfather clauses reflect the legislative policy that the new regulatory process shall be effective prospectively. Since that legislative policy may have a conceivably rational basis, grandfather exclusions are not invidious per se and violative of equal protection. See *Affiliated Distillers Brands Corp. v. Sills,* 56 *N.J.* 251 (1970), mod. on other grounds 60 *N.J.* 342 (1972). The question from an equal protection viewpoint is whether there is a justifiable basis for the discrimination. A classification will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland*, 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961). If there is a conceivable legitimate purpose for the grandfathering, the legislative action will be upheld. [*Id.* at 441.]

Applying this standard, we find it difficult to conceive a rational basis for excluding other municipalities that may satisfy the requirements of *N.J.S.A.* 54:4–5 at any time after September 22, 1980, the effective date of *N.J.S.A.* 54:4–5.2. *See Fagan v. Payne*, 75 *N.J.L.* 851 (E. & A.1907); *Seymour v. Orange*, 74 *N.J.L.* 549 (E. & A.1906). The reasoning that supports the constitutionality of *N.J.S.A.* 54:4–5 prior to the

amendment that precludes its application to other municipalities, *see supra* Parts IV, V, VI, would apply as well to municipalities that in the future satisfy the requirements of the rebate act. Accordingly, we find *N.J.S.A.* 54:4–5.2, the supplement to *N.J.S.A.* 54:4–5, to constitute special legislation in violation of the New Jersey Constitution. *See also Newark Superior Officers, supra,* 98 *N.J.* at 231.

We hold, however, that the grandfather clause may be severed from the statute and the remaining valid parts sustained. The rule of severability was succinctly set forth in *Affiliated Distillers Brands Corp. v. Sills,* 56 *N.J.* 251 (1970). In that case we analyzed the issue of when a clause or amendment to a statute can be severed without destroying the validity of the remaining statute.

> Severability is a question of legislative intent. *Angermeier v. Borough of Sea Girt,* 27 *N.J.* 298, 311 (1958). The governing principle is whether it can be fairly concluded that the Legislature designed the statute to stand or fall as a unitary whole. In reaching this conclusion, we must determine whether the objectionable feature can be excised without substantial impairment of the principle object of the statute. *N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners,* 48 *N.J.* 581, 593 (1967). An entire statute will not be invalidated when one clause is found to be unconstitutional unless that clause is so intimately interconnected with the whole that it can be reasonably said that the Legislature would not have enacted the statute without the offending clause. [*Id.* at 265.]

We reiterated this principle in *Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412 (1977):

> It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone.... Courts will enforce severability where the invalid portion is independent and the remaining portion forms a complete act within itself. [*Id.* at 422–23.]

*See also Newark, supra,* 98 *N.J.* at 231.

We find that without the grandfather clause the statute is complete within itself. The severance of the amendment from the statute will not harm the objective or purpose of the statute, that is, that municipalities be compensated in part for the expense of hosting a county or state institution, expenses

that they would have recovered if the property in question were not exempt from taxation. We agree with Judge Evers' finding that the supplement cannot be construed as a substantive alteration of the rebate statute; rather, that it is, indeed, supplementary in the truest sense of that word. *Mahwah Tp., supra,* 3 *N.J.Tax* at 552. Accordingly, we hold that the supplement, *N.J.S.A.* 54:4-5.2, can be severed from *N.J.S.A.* 54:4-5, which statute remains valid.

The judgment below is affirmed in part and reversed in part.

*For affirmance in part, reversal in part* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI—6.

*Opposed*—None.