NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**MARY SIOBHAN BRENNAN**
JUDGE

Essex County Dr. Martin Luther King, Jr. Justice
Building 495 Martin Luther King Blvd. - Fourth Floor
Newark, New Jersey 07102-0690
(609) 815-2922 Ext. 54600
Fax: (973) 424-2424

February 24, 2022

Gregory J. Castano Jr., Esq.
CASTANO QUIGLEY LLC
155 Passaic Avenue, Suite 340
Fairfield, N.J. 07004

Peter J. Zipp, Esq.
Joseph G. Buro, Esq.
ZIPP & TANNENBAUM, LLC
280 Raritan Center Parkway
Edison, New Jersey 08837

Anthony D. Tancini, Esq.
Michelline C. Foster, Esq.
Office of the Attorney General
Division of Law
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 106
Trenton, New Jersey 08625

Re: **Town of Kearny v. PSE&G Services Corp.**
Docket No. 011505-2014

Dear Counsellors,

This letter opinion sets forth the court's findings of fact and conclusions of law on Plaintiff's motion for partial summary judgment and Defendant's motion for partial summary judgment in the above referenced matter.[1] R. 1:7-4. For the reasons explained in depth below, the court upholds the constitutionality of the Business Retention Act ("BRA"), N.J.S.A. 54:4-1.13

---

[1] By Order dated February 22, 2022, all 240 related docket numbers are consolidated under this single docket number.

*et. seq.*, and its 1997 Amendment. The court also finds that it has jurisdiction over the 2016 through 2017 tax appeals filed by Plaintiff.

## I. Findings of Fact

Plaintiff, the Town of Kearny ("Municipality") is in the western part of Hudson County, New Jersey, and is a suburb of the city of Newark. Defendant, PSE&G Services Corp ("PSE&G"),[2] is a New Jersey electric services provider with a business address of 80 Park Plaza in Newark, New Jersey.

Within the Municipality, PSE&G owns thirty-three (33) contiguous, or near contiguous parcels ("Site").[3] At the center of the Site is the Kearny Generating Station and the Kearny Switching Station, both located on Block 298, Lot 19.01. The "out parcels"[4] are – for the most part – linear parcels housing overhead power lines transmitting electricity north, east, and west of the site.

---

[2] PSE&G is the plaintiff in docket numbers 010910-2013, 000204-2019, 000205-2019, 011141-2015, 010659-2016, 009771-2017, 010030-2018, 011140-2015, 007032-2016, 004745-2017, 006122-2018, 007190-2019, 002432-2020, 002473-2021.

[3] The moving papers cite 32 parcels, but the court has identified 33 parcels.

[4] The other block and lots are as follows: Block 149 Lot 11.01; Block 205 Lots 21.02, 36; Block 284 Lots 14.02, 30, 42, 43; Block 285 Lots 1.03, 12; Block 286 Lots 10.01, 17.01, 25.01, 25.02, 25.04, 26.01, 28.01, 29; Block 287 Lots 4.02, 6, 58, 66; Block 293 Lots 3, 5, 6, 7, 8, 10.01, 10.03; Block 298 Lots 19.03, 20, 21, 22.

*Kearny Generating Station and Switching Station*

The Kearny Generating Station ("generating station") is a peaking power station[5] consisting of turbines and generators and is situated on 70.05 acres of land. It runs and operates only during extreme power demand periods to supplement the ordinary power produced at full-time operating stations. Unlike an ordinary power plant, the units at this generating station sacrifice efficiency for expediency; the units can be brought into full operation in fifteen minutes, whereas an ordinary power plant may take hours, but burn more efficiently.

The original generating station was placed into operation in 1926 and consisted of six coal-fired generating units referred to as Units 1 through 6. PSE&G decommissioned these units in the 1970s. Units 7 and 8 were placed into service in 1953 and consisted of steam combustion turbines. These were decommissioned in 2005, resulting in 300,000 square feet of non-usable space. Both sets of decommissioned generating units are housed in non-usable buildings on the east end of the Site. Unit 9 contained one aero-derivative natural gas-fired jet turbine, which was completely destroyed by Hurricane Sandy in 2012 and decomissioned on August 4, 2014. Unit 9 encompases significantly less non-usable space, only covering 1,200 square feet.

The current generating station consists of ten-simple-cycle combustion turbine units installed in 2001, referred to as Units 12 through 14. Unit 12 contains four (4) generators, Unit 13 contains four (4) generators, and Unit 14 contains two (2) generators. Each of the ten turbine-generator sets contains a 45MW LM6000 PC turbine and a two-pole air cooled generator. Both

---

[5] The generating station is used during times of peak energy usage, such as in the summer when people consume more energy by turning on air conditioning systems.

the turbine and the generator for each unit are modular; they were shipped to the Site in one piece and can be removed from the Site in one piece.[6] The units may also travel between peaking sites in New Jersey, as needed.

In October 2012, PSE&G invested approximately 250-million-dollars in improvements to the machinery, apparatus, and equipment located at the Site. This included the installation of six (6) new General Electric LM6000 generators. There was no concurrent increase in assessment values resulting from these 2012 upgrades.[7]

The Kearny Switching Station ("switching station") was built in the 1920s and expanded periodically as modernized generating units were added to the generating station. Currently, the switching station consists of eleven high voltage circuit breakers, associated disconnect switches, high voltage line take-off structures interconnecting other substations and generating units, and three control houses utilized for the operation of the switching station. The parcel where the generating station and the switching station is located (Block 298, Lot 19.01) contains 844,947 square feet of building space, of which only 29,500 is usable space.

---

[6] For example, Unit 14, subunit 1 was removed from the Site and shipped to Calgary for maintenance on October 16, 2020 and returned to the Site on December 21, 2020.

[7] Only minimal changes have occurred in the assessment values of a few parcels since 2013. Assessment values on Block 205 Lot 36 and Block 284 Lot 14.02 changed between 2014 and 2015; Block 284 Lots 42, 43 and Block 298 Lots 21, 22 in 2017; and Block 293 Lots 6, 7 in 2019. .

From 2010 through 2020,[8] the Municipality received property tax payments from PSE&G for land and improvements (excluding machinery, apparatus, and equipment) as listed below:

| Year | Total Assessment | Tax Rate (%) | Total Tax Revenue |
|------|------------------|--------------|-------------------|
| 2010 | $17,078,200 | 9.171 | $1,566,241.72 |
| 2011 | $17,078,200 | 9.467 | $1,616,793.19 |
| 2012 | $17,031,000 | 9.618 | $1,638,041.58 |
| 2013 | $21,851,300 | 9.791 | $2,139,460.78 |
| 2014 | $21,851,300 | 10.036 | $2,192,996.47 |
| 2015 | $21,851,300 | 10.326 | $2,256,365.24 |
| 2016 | $21,851,300 | 10.669 | $2,331,315.20 |
| 2017 | $21,819,500 | 10.705 | $2,335,777.48 |
| 2018 | $21,819,500 | 10.561 | $2,304,357.40 |
| 2019 | $22,089,500 | 10.542 | $2,328,675.09 |
| 2020 | $22,089,500 | 10.490 | $2,317,188.58 |

Additionally, the Municipality received funds from the State of New Jersey ("State") as part of a revenue stream funded pursuant to the Energy Tax Receipts Property Tax Relief Act, N.J.S.A. 52:27D-438 ("Energy Tax Act"). Every year since 2010, the Municipality has received an annual payment of $18,465,489 in energy industry funded supplemental payments.

---

[8] The court has not been provided with the property tax payments for 2021 but assumes that the amount is not significantly different.

From the foregoing data, all parties agree that PSE&G's 250-million-dollar investment in machinery, apparatus, and equipment did not influence the payments to the Municipality in assessment tax revenue, nor did it result in an increase to the Municipality's energy industry funded supplemental revenue from the State.

## II. Procedural History

The procedural history of these matters is complicated, to say the least.

The Site's real property tax assessments consist of mostly land value, with improvement value to parcels containing buildings. The value of machinery, apparatus, and equipment at the Site has been statutorily-exempt from real property tax since 1961.

In 2013, PSE&G filed a traditional appeal of the property tax assessment for Block 293 Lot 10.01.[9]

In 2014, the Municipality filed 33 separate tax appeals with the Hudson County Board of Taxation ("County Board") to increase the assessments based upon PSE&G's 2012 investment in machinery, apparatus, and equipment at the Site. On June 6, 2014, the County Board issued Memorandums of Judgment ("county board judgments") affirming the original assessments, utilizing Code 6B, Dismissal without Prejudice – Hearing Waived.

The Municipality filed appeals of the 2014 county board judgments with the New Jersey Tax Court ("Tax Court") on July 21, 2014. The three-count Complaints alleged that the assessments were undervalued due to the unaltered assessed value, in conjunction with the increased property value resulting from the 2012 fixture upgrades. The Municipality contended

---

[9] The Docket Number is 010910-2013.

that the machinery, apparatus, and equipment exemption from the assessed value violates the Uniformity Clause[10] and/or the Special Legislation Clause[11] of the New Jersey Constitution. The Complaints also assert that the exemption granted pursuant to the BRA, N.J.S.A. 54:4-1.13 *et. seq.*, the Energy Tax Act, and the Corporation Business Tax Act ("CBT"), N.J.S.A. 54:10A-1 *et seq.*, is invalid.

PSE&G filed Answers and Counterclaims on August 1, 2014. The four-count Counterclaims alleged that the assessment values exceeded the property's true value, the Municipality needed a municipal wide revaluation, and the Director, Division of Taxation's Chapter 123 ratio was erroneous and in need of correction.

---

[10] New Jersey's 1947 Constitution contains what is referred to as the "Uniformity Clause" which states:

> Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
>
> [N.J. Const. art. VIII, § I, ¶ 1(a).]

This section was based on an 1875 Amendment to New Jersey's 1844 Constitution. N.J. Const. art. VIII, § I, ¶ 2 "grandfathered" all property tax exemptions "validly granted" (under the 1844 Constitution) "and now in existence." But it subjected those exemptions to future legislative amendment or repeal, "except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes . . ." Further, it granted the Legislature the power to enact other exemptions "only by general law." The Constitution also allowed the Legislature to permit municipalities to grant exemptions or abatements in areas in need of redevelopment and rehabilitation.

[11] "The Legislature shall not pass any private, special or local laws … relating to taxation or exemption therefrom." N.J. Const. art. IV, § VII, ¶ 9(6)

PSE&G filed four-count complaints appealing the 2015 county board judgments on July 24, 2015 for 11 parcels.[12] On July 27, 2015, the Municipality filed 32 three-count Complaints,[13] asserting the same contentions as in their 2014 appeals. PSE&G responded with Answers and three-count Counterclaims on August 3, 2015.[14]

On March 31, 2016, PSE&G directly filed four-count Complaints with the Tax Court, challenging the 2016 real property tax assessments for Block 298, Lots 19.01, 19.03, 20, 21, and 22.[15] The Municipality filed petitions with the County Board for these parcels, as well as the 27 other parcels at the Site. Like earlier years, the County Board affirmed the original assessments, and the Municipality appealed the county board judgments to the Tax Court.

2017 through 2018 followed a similar procedure to the 2016 appeals.

On August 17, 2018, the Honorable Joseph Andresini, P.J.T.C. signed four Consent Orders of Consolidation for the then existing tax appeals, utilizing docket numbers 011505-2014, 011508-2014, 011532-2014, and 011525-2014.

In 2019, all appeals were filed directly with the Tax Court. The Municipality filed 32 three-count Complaints, and PSE&G responded with Answers and Counterclaims. PSE&G also filed a

---

[12] Docket numbers 011141-2015 and 011140-2015. PSE&G also filed appeals of the county board judgments for the 2016-2018 tax years for Block 293, Lots 3, 5, 6, 7, 10.01, 10.03.

[13] Block 205 Lot 21.02 was only appealed in 2014.

[14] PSE&G did not file Counterclaims for Block 293 Lots 3, 5, 6, 7, 10.01, 10.03 and Block 298 Lots 19.01, 19.03, 20, 21, 22.

[15] PSE&G filed direct Complaints for these properties for the 2017-2021 tax years.

8

direct appeal for a 2017 omitted added assessment and a 2018 added assessment on Block 205 Lot 36 Qualifier HM.[16]

On March 6, 2020, PSE&G filed a direct appeal on five parcels.[17] The Municipality did not file Answers or Counterclaims. The Municipality filed petitions with the County Board on May 15, 2020, challenging the property assessments on 32 parcels. The County Board affirmed the assessments on August 6, 2020; the Municipality appealed the county board judgments to the Tax Court on September 11, 2020. PSE&G responded with Answers and Counterclaims on September 22, 2020 for 31 parcels.[18]

On March 1, 2021, PSE&G filed a direct appeal with the Tax Court covering five parcels.[19] The Municipality filed petitions with the County Board on 31 parcels and one direct appeal to the Tax Court.[20] The county board petitions were dismissed, and on July 29, 2021, the Municipality filed 31 appeals of the county board judgments with the Tax Court. PSE&G filed Answers and Counterclaims for the 31 appeals filed by the Municipality.[21] The Municipality and PSE&G

---

[16] Docket numbers 000204-2019 and 000205-2019.

[17] Filed on Block 298, Lots 19.01, 19.03, 20, 21, and 22.

[18] PSE&G did not file an Answer and Counterclaim on Block 298, Lot 19.01 under docket number 007732-2020. PSE&G did file a direct appeal on this parcel.

[19] PSE&G filed a Complaint (docket number 002473-2021) on Block 298, Lots 19.01, 19.03, 20, 21, and 22.

[20] On March 25, 2021, the Municipality filed a direct appeal (docket number 005865-2021) for Block 298 Lot 19.01, where the generating station is located.

[21] PSE&G filed an Answer on Block 298 Lot 19.01 but did not file a Counterclaim. Instead, PSE&G filed a direct appeal on this property under docket number 002473-2021.

withdrew 31 of the 2021 Complaints and Counterclaims without prejudice. Currently, two 2021 direct appeals remain open.

On August 5, 2020, the then existing matters were transferred from Judge Andresini to this court. On August 21, 2020, the Municipality filed motions for partial summary judgment under docket numbers 011505-2014, 011508-2014, 011532-2014, and 011525-2014, challenging the constitutionality of the BRA exemption for machinery, apparatus, and equipment. On January 15, 2021, PSE&G filed opposition to the Municipality's motions. Additionally, PSE&G filed cross-motions for partial summary judgment on most of their 2016 through 2020 direct appeals.[22] PSE&G alleges that the court does not have jurisdiction to decide the Municipality's appeals from the county board judgments on selected parcels, claiming those judgments were void due to PSE&G's direct filing with the Tax Court.

As part of PSE&G's opposition, it also argued that the Municipality's motions constituted a "facial" challenge to the BRA's constitutionality (as opposed to an "as applied" challenge), requiring intervention from the New Jersey Attorney General. On March 12, 2021, the Municipality filed a response disputing the intervention. The court gave the New Jersey Attorney General the opportunity to intervene. By consent order, the New Jersey Attorney General's office intervened on September 28, 2021.

---

[22] Docket numbers 011338-2016, 010105-2017, 011127-2018, 005243-2019, 007732-2020, 005865-2021, 011340-2016, 010108-2017, 011128-2018, 011325-2019, 010674-2020, 011341-2016, 010106-2017, 011130-2018, 011326-2019, 010675-2020, 011342-2016, 010109-2017, 011131-2018, 011327-2019, 010676-2020, 011343-2016, 010110-2017, 011132-2018, 011328-2019, 010677-2020.

On December 17, 2021, the New Jersey Attorney General filed opposition to the Municipality's motions and filed a cross-motion in support of PSE&G's opposition on the constitutionality issue only. The State argues that the BRA and its 1997 amendment are constitutional, and do not violate the Uniformity Clause or the Special Legislation Clause of the New Jersey Constitution under either a "facial" or an "as applied" challenge. Reply briefs were filed by the Municipality and PSE&G on January 14, 2022. The court heard oral argument via Zoom on January 27, 2021.

### III. Legal Analysis

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995), our Supreme Court established the standard for summary judgment as follows:

> [W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

"The express import of the Brill decision was to 'encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.'" Township of Howell v. Monmouth Cnty Bd. of Taxation, 18 N.J. Tax 149, 153 (Tax 1999) (quoting Brill, supra, 142 N.J. at 541).

11

For the purposes of these motions for partial summary judgment, the material facts pertinent to this matter are not disputed. There is no dispute that PSE&G installed new natural gas-fired generators, resulting in a substantial change to the fair market value of the Site. There is also no dispute as to the filings of appeals to the County Tax Boards and the Tax Court for years 2016 through 2020. To this extent, partial summary judgment as to both issues is appropriate.

**Part One – Constitutionality of the Business Retention Act and/or the 1997 Amendment**

*The Arguments*

The Municipality moves for partial summary judgment, asking the court to find that the exemption afforded to PSE&G pursuant to the BRA is unconstitutional as applied to the Site. The Municipality seeks to restore its constitutional and equitable rights to have all property within its jurisdiction taxed by uniform rules and without any special exemptions. The Municipality argues that it has been deprived of its right to collect additional tax revenue related to the significant increase in the Site's value due to PSE&G's 250-million-dollar investment in machinery, apparatus, and equipment in 2012.

The Municipality claims that the BRA creates an unconstitutional, separate, and special exemption for the machinery, apparatus, and equipment of one industry: namely remitters of transitional energy, including PSE&G. While acknowledging that the Legislature's implementation of the Energy Tax Act was designed to offset the loss of property tax revenues to local governments caused by the BRA exemption, the Municipality complains that the resulting legislative scheme denies it additional revenue. Simply put, the Municipality objects to the fact

12

that PSE&G's 250-million-dollar investment did not result in a concomitant increase to the energy industry funded supplemental payments or conventional real property tax payments.

The Municipality's argument centers on the New Jersey Constitution's Uniformity Clause and the Special Legislation Clause. Based on these constitutional mandates, the Municipality claims the BRA exemption is unconstitutional "as applied" to the Site. Exempting only remitters of transitional energy from taxation of their machinery, apparatus, and equipment, it claims, violates the mandate that all property be assessed pursuant to "uniform rules," and is constitutionally prohibited as a "special or local law relating to taxation."

The Municipality labels its challenge to the BRA an "as applied" challenge, relying upon General Motors Corp. v City of Linden, 150 N.J. 522 (1997), in which the New Jersey Supreme Court upheld the BRA's constitutionality but preserved the right to "as applied" challenges. It argues that statutes must be construed to avoid constitutional defect (citing County of Warren v State, 409 N.J. Super 495, 506 (App. Div. 2009)). The Municipality suggests that, as a remedy to preserve the BRA's constitutionality, it must be afforded the opportunity to impose an additional conventional tax to capture the substantial increase in the Site's value, resulting from the October 2012 upgrades.

PSE&G and the State take the position that the Municipality's motion is a "facial challenge" to the BRA. They defend the validity of the BRA exemption, arguing that the exemption provision does not violate the Uniformity Clause or the Special Legislation Clause. They also claim that the BRA exemption withstands constitutional scrutiny because it is not solely based upon the status of the property owner (a current or former remitter), but rather is based upon the character and use of property.

13

An "as applied" challenge, stands for the proposition that the statute's application in the context in which a party has acted, or proposes to act, is unconstitutional. In other words, it is not the statute itself that is unconstitutional, but rather it is how the statute is being enforced as it pertains to an individual, in this case PSE&G, that is questionable.

Conversely, a "facial" challenge, is a claim that the statute in its entirety is unconstitutional and inoperative. This would mean that the BRA exemption would be unconstitutional in every application.

For the Municipality to succeed on a "facial" challenge it must overcome the strong presumption of validity that attaches to the Legislature's acts, to which the courts "extend every possible presumption in favor of a statute's constitutionality and that only legislative enactments that are clearly repugnant to the Constitution are to be declared void." Borough of Rocky Hill v. State, 420 N.J. Super. 365, 378 (Ch. Div. 2010) (citing State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32 (1991)); Paul Kimball Hosp. v. Brick Twp. Hosp., 86 N.J. 429, 446-47 (1981).

The New Jersey Supreme Court dismissed a "facial" challenge to the BRA's 1997 amendment in General Motors Corp.,150 N.J. at 522. However, the Supreme Court did not go so far as to prohibit "as applied" challenges to the BRA.

The relevant BRA 1997 amendment reads as follows:

> a. Nothing in this act shall be construed to limit municipal taxation of real estate pursuant to R.S.54:4-1 of current or former remitters of the transitional energy facility assessment, or of a corporate or non-corporate legal successor or assignee of a current or former remitter of the transitional energy facility assessment whether through any reorganization, sale, bankruptcy, consolidation, merger or other transaction or occurrence of any kind without limitation. As used in this section, "real estate" means lands and buildings, but

14

shall not include items of the type as set forth in the list of scheduled property for gas systems and electric light, heat and power systems in section 10 of P.L.1940, c.5 (C.54:30A-58) prior to January 1, 1998. As provided in that list, railways, tracks, ties, lines, wires, cables, poles, pipes, conduits, bridges, viaducts, dams and reservoirs (except that the lands upon which dams and reservoirs are situated shall be included as real estate), machinery, apparatus or equipment, notwithstanding any attachment thereof to lands or buildings owned by current or former remitters of the transitional energy facility assessment, or of a corporate or non-corporate legal successor or assignee of a current or former remitter of the transitional energy facility assessment whether through any reorganization, sale, bankruptcy, consolidation, merger or other transaction or occurrence of any kind without limitation, are not real estate.

**b.** No municipality, regional or county governmental agency shall directly or indirectly tax as real property, or include within the assessment of real property, the public utility owned electrical interconnect, water lines or gas lines, or any value thereof, which were set forth in the list of scheduled property for gas systems and electric light, heat and power systems in section 10 of P.L.1940, c.5 (C.54:30A-58), prior to enactment of this act whether or not on the real estate of current or former remitters of the transitional energy facility assessment.

[N.J.S.A. 54:4-1.17 (a) and (b).]

The BRA defines "machinery, apparatus, or equipment" as "any device, mechanism, instrument, tool, tank, or item of machine, tangible personal property used or held for use in business." N.J.S.A. 54:4-1.15.

The Municipality argues that the BRA's 1997 amendment is unconstitutional "as applied" to the Site, because the resulting tax exemption is directly contrary to the Uniformity Clause and the Special Legislation Clause; consequently, it deprives the Municipality of constitutionally protected revenue.

PSE&G and the State interpret the Municipality's challenge to be a "facial" one, with application to all remitters of transitional energy under any circumstances, and as to any property. To validate their argument they explain how, in the context of real property taxation, certain utility-

owned property has been treated as distinct from other real property for over a century. They contend that the Legislature held a rational and reasonable basis for excluding the machinery, apparatus, and equipment of a remitter of transitional energy. Specifically, the Legislature believed the statutory scheme would foster business opportunities in the manufacturing sector and decrease overall energy costs throughout the State.

*Historical Background of the Uniformity Clause*

Neither the Constitution of 1776 nor that of 1844 contained a Uniformity Clause. See N.J. Const. of 1776; N.J. Const. of 1844. At a special election on September 7, 1875, the voters ratified an amendment to the 1844 Constitution. The amendment added a new paragraph to the Legislative Article and provided: "Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value." N.J. Const. of 1875 art. IV, § 7, ¶ 12. "The forces that motivated" the amendment "are clear." New Jersey State League of Muns. v. Kimmelman, 105 N.J. 422, 428 (1987). "The dominant industry of that time, the railroads, exerted considerable influence over the Legislature's taxing power and had obtained for itself virtual exemption from taxation." Ibid. The 1875 Amendment attempted "the first limited restraint against preferential tax treatment for one industry." Ibid.

The 1875 Amendment, however, proved ineffective. Id. at 430. Courts construed the Amendment "to permit the Legislature not only to segregate railroad property for valuation purposes, but also to deliberately assess against it a lower rate than that paid by other property." Proceedings of the State of New Jersey Constitutional Convention of 1947, Committee on Taxation and Finance, Vol. V, 545, 573. The "preferential treatment" of real property owned by railroads therefore "continued." League of Muns., 105 N.J. at 430.

16

At the 1947 Constitutional Convention, a vigorous "debate about uniformity" occurred and "centered inevitably on the preferential position afforded to railroad property and specifically on the possibility that real property taxed for the benefit of municipalities could ever again be subject to discriminant taxation by a Legislature." Id. at 432. Governor Driscoll testified during the Convention Proceedings and argued that "the insistence on taxation at true value presented insuperable obstacles insofar as it applied to all types of property, i.e., business personal property, intangibles, and so forth." Id. at 433. He drew a distinction between "real property" and other "types of property and classes of taxpayers." Proceedings of the State of New Jersey Constitutional Convention of 1947 at 772. "Out of this struggle came a political compromise" that "would delete the true value requirement from the tax clause but would require that as to real property, then and now the lifeblood of local government, discriminatory burdens be forever barred." League of Muns., 105 N.J. at 433.

To accomplish this purpose, an amendment to the Uniformity Clause was proposed at the Convention and ratified by the voters. This 1947 amendment specified that "[a]ll real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value." N.J. Const. art. VIII, § 1, ¶ 1(a). This amendment further clarified that all "real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district." Ibid.

Our courts have narrowly construed the Uniformity Clause to be consistent with its historical intent and purpose. As our Supreme Court has stated, "constitutional history and judicial precedent adjure a strict application of the tax clauses to real property." 2nd Roc-Jersey Assoc. v. Town of Morristown, 158 N.J. 581, 591 (1999). Where taxation does not expressly implicate real

property, no violation of the Uniformity Clause exists. General Motors Corp. v City of Linden, 293 N.J. Super. 99, 103 (App. Div. 1996), aff'd, 150 N.J. 522 (1997). In short, the history of the Uniformity Clause demonstrates that the more rigorous provision, which requires that real property in a taxing district be assessed the same standard of value, applies only to real property consisting of land and improvements, not machinery, apparatus, and equipment.

*History of the Business Retention Act*

The BRA's legislative history is a necessary component in analyzing its constitutionality and the Legislature's intent.

There are several reasons for the statutory disparate treatment of public utilities. First, public utilities in New Jersey were granted exclusive franchises to operate in a defined region for the benefit of rate payers. Second, public utilities are closely regulated by the New Jersey Board of Public Utilities ("BPU"). Third, as of 1961, and until the law was repealed in 1997, public utilities were subject to the Gross Receipts and Franchise Tax Act ("GR&FT Act"), which replaced the ordinary scheme of taxation applied to other property.

The GR&FT Act authorized the imposition of "excise and franchise taxes measured by the gross receipts of certain enumerated public utilities and for the apportionment of the net proceeds thereof among the municipalities wherein or in whose streets 'scheduled property' of the utility is situated." Pub. Serv. Elec. & Gas Co. v. Woodbridge Twp., 73 N.J. 474, 477 (1977). It was the "sole means by which public utilities [were] taxed." Pub. Serv. Elec. & Gas Co. v. Woodbridge Twp., 139 N.J. Super. 1, 8 (App. Div. 1976). Its purpose was "to provide a complete scheme and method for the taxation of . . . gas and electric light, heat and power corporations using or occupying the public streets, highways, roads or other public places" and "to exempt from taxation other than

18

imposed by th[e] act the franchises, stock and certain property of such corporations and for the taxation of the property of such corporations not so exempted from taxation." Ibid.

Thus, the GR&FT Act provided an exemption from local property taxation for certain real property. In lieu of property taxes, municipalities received an apportionment of the net proceeds of gross receipts taxes collected by the State. The State allocated the proceeds among the municipalities, which accommodated the utility property from which the gross receipts tax was derived. The Act assigned "unit values to each type of public utility property located in the State according to the statutory schedule set forth in N.J.S.A. 54:30A-58, and the taxes collected [we]re apportioned and distributed on the basis of the relative value of the scheduled property in each municipality." Ibid

This "complete scheme and method for the taxation [of public utilities]" persisted in the State for over 35 years. However, in the late 1970s, "electricity rates increased dramatically [and] . . . . [b]y 1985 New Jersey consumers were paying about 50% above the national average for electricity." In re Pub. Serv. Elec. And Gas Co. Rate Unbundling, 330 N.J. Super. 65, 84 (App. Div. 2000), aff'd, 167 N.J. 377 (2001), cert. denied sub nom. This was due in part to high production costs resulting from "expensive utility-owned nuclear power plants and expensive power purchase agreements with nonutility generators."

"Competition began in the production aspect of the electric power industry after Congress enacted the Public Utility Regulatory Policies Act of 1978, 16 U.S.C.A. §§ 2601-2645,which provided incentives to develop nonutility electricity generation." Ibid. "Because of various federal initiatives, by 1997 there were a growing number of power producers and suppliers offering power for sale regionally at competitive prices." Ibid.

19

The State decided to embark on a massive reform to the generation, transmission, and distribution of the electric power supply. On January 16, 1997, the BPU issued a report concluding that retail electric customers in New Jersey should have the ability to choose their electric power supplier and directing the four utilities to file a restructuring plan and unbundling petition by July 15, 1997. Id. at 85.

In addition, the Legislature adopted L. 1997, c. 162, which repealed the GR&FT Act and made utilities subject to the CBT, the Sales and Use Tax (SUT), and the newly created Transitional Energy Facilities Assessment (TEFA) and Uniform Transitional Utility Assessment (UTUA). While application of the CBT and SUT applied to utilities and non-utilities alike, the TEFA and UTUA only applied to utilities and former utilities which formerly paid or "remitted" the GR&FT.[23] These subject entities are referred to as "remitters."[24]

The repeal of the GR&FT Act resulted in the loss of a significant source of revenue for municipalities hosting these facilities. For this reason, the Legislature also passed a companion bill, the Energy Tax Act L. 1997, c. 167, which served as a dollar-for-dollar substitute for GR&FT Act

---

[23] N.J.S.A. 54:30A-104 ("Every gas and electric light, heat and power corporation subject to tax pursuant to the provisions of P.L. 1940, c. 5 (C. 54:30A-49 et seq.) prior to January 1, 1998, or the corporate or non-corporate legal successor or assignee whether through any reorganization, sale, bankruptcy, consolidation, merger or other occurrence of any kind without limitation, and every corporation otherwise assessable set forth hereinbelow, shall annually pay the transitional energy facility assessment."); N.J.S.A. 54:30A-117 ("Every gas and electric light, heat and power corporation, municipal or otherwise, that was subject to the P.L. 1940, c. 5 (C. 54:30A-49 et seq.) prior to January 1, 1998 . . . shall annually pay an annual assessment annually determined by the Director of the Division of Taxation as provided in this section.").

[24] See N.J.S.A. 54:30A-102 ("'Remitter' means any corporation subject to assessment under this act."); N.J.S.A. 54:30A-116 ("'Remitter' means any corporation subject to assessment under this act."). Taken together, a "remitter" of the TEFA and/or the UTUA is any entity that formerly paid the GR&FT, including PSE&G.

revenue previously allocated to municipalities. This substitute is codified at N.J.S.A. 52:27D-439, which provides that "[t]here shall be paid during the State fiscal year 1998 and during each fiscal year thereafter from the 'Energy Tax Receipts Property Tax Relief Fund' to the municipalities of the State the sum of $740,000,000 or the amount determined pursuant to subsection e. of this section."

The statute further provides for an allocation of funds, to the municipalities, in accordance with subsection (b)(2), based on how much utility equipment is sited in the municipality. The revenue[25] for this newly-created fund is derived from taxes paid by the utilities and remitters. Ibid.

The statutory scheme for what property is subject to real property taxation relating to land and improvements remained unchanged. The GR&FT revenue was replaced with revenue from the Energy Tax Act. Thus, as before, all property not qualifying as "lands" or "buildings" were exempt from local property taxes.[26]

---

[25] Revenues are derived from "net payments under SUT from sales and use of energy or utility services, net payments under the CBT from gas, electric, and gas and electric public utilities, whether municipal or otherwise, that were subject to the provisions of P.L. 1940, c. 5 prior to January 1,1998, and net payments under the TEFA."

[26] See N.J.S.A. 54:4-1.17 stating that, "[a]s used in this section, real estate means lands and buildings, but shall not include items of the type as set forth in the list of scheduled property for gas systems and electric light, heat and power systems . . . prior to January1, 1998" and that "[n]o municipality, regional or county governmental agency shall directly or indirectly tax as real property, or include within the assessment of real property, the public utility owned electrical interconnect, water lines or gas lines, or any value thereof, which were set forth in the list of scheduled property for gas systems and electric light, heat and power systems . . . prior to enactment of this act whether or not on the real estate of current or former remitters of the transitional energy facility assessment."

*Legal Precedence - The General Motors Corp. Decision*

The General Motors Corp. case involved a challenge to the constitutionality of the BRA, arising from a claim that it violated the Uniformity Clause of the New Jersey Constitution. 150 N.J. at 522. The Court found that the BRA "represents an effort by the Legislature to define a class of business personal property that would not have been considered real property under the common law understanding of real property at the time of the 1947 Constitution." General Motors Corp., 150 N.J. at 539. The Court in holding the BRA to be "facially" constitutional, recognized however that future "as applied" challenges could be raised. Id. at 539-40. With respect to a future "as applied" challenge, the Court noted that the phrase "machinery, apparatus, or equipment" does not have "boundless meaning," and speculated that an issue could arise with respect to the definition of those terms. Ibid.

To determine whether a taxing statute is "facially" constitutional, the Court had to decide whether the law operates constitutionally in at least some circumstances. General Motors Corp., 150 N.J. at 532. This standard stems from the United States Supreme Court decision in United States v. Salerno, which held that for a party to successfully mount a "facial" challenge to a legislative act, "the challenger must establish that no set of circumstances exists under which the Act would be valid." Pfizer Inc. v. Dir., Div. of Taxation, 24 N.J. Tax 116, 124 (Tax 2008) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

As such, the burden of proof is significantly higher for a plaintiff asserting a "facial" challenge. On the other hand, a plaintiff asserting an "as applied" challenge only needs to show that the statute is invalid within "the context of the particular case." Ibid.

The Tax Court previously held that the BRA is the Legislature's effort "to define a certain

22

class of business personal property that would not have been considered real property under the common-law understanding of real property at the time of the 1947 Constitution was adopted." Mobil Oil Corp. v. Township of Greenwich, 22 N.J. Tax 1, 17 (2004) (Tax Court held that it was reasonable for the Legislature to classify petroleum refinery equipment as personal property, and therefore, did not violate the Uniformity Clause of the New Jersey Constitution of 1947).

*Special Legislation Clause*

The State Constitution provides that the Legislature must not pass any private, special, or local laws related to taxation or exemption of taxation. N.J. Const. art. IV, § VII, ¶ 9(6). To determine if a law is special legislation, courts apply a three-part test established in Vreeland v. Byrne, 72 N.J. 292 (1977). The Vreeland test requires the court to: i) discern the purpose and object of the enactment; ii) apply the purpose and object to the factual situation; and iii) decide whether the classification, "as so applied," can rest on any rational or reasonable basis related to the purpose and object of the legislation. Id. at 300-301.

Prior to applying the Vreeland test, the Supreme Court provided three guiding principles applicable to determining whether a statute is unconstitutional as special legislation. See Mahwah v. Bergen County Board of Taxation, 98 N.J. 268, 282 (1985). First, "a statute is presumed to be constitutional, and it will not be declared void unless the statute is clearly repugnant to the Constitution." Ibid. Second, "the burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates the constitutional provision." Id. at 283. Third, "in deciding whether an act is special or general legislation, the determining factor is what is excluded, not what is included." Ibid.

A statute must "clearly and irremediably violate the ban on special legislation to be

23

invalidated." Town of Secaucus v. Hudson Cnty. Bd. of Taxation, 133 N.J. 482, 493 (1993). "The Legislature has wide discretion in determining the perimeters of a classification, [and] an adequate factual basis for the legislative judgment is presumed to exist." Paul Kimball Hosp., Inc. v. Brick Twp. Hosp., Inc., 86 N.J. 429, 448 (1981).

The Tax Court held in Motor Oil Corp. that the BRA did not, "as applied," violate the constitutional prohibition against special legislation. 22 N.J. Tax at 20. Applying the three-part Vreeland test, the court noted that a statute will be upheld if the Legislature had a rational or reasonable basis for the law. Id. at 20. In addition, the court pointed out that the plaintiff bears the burden of showing that there is no rational or reasonable basis for the legislation. Ibid. After finding that the plaintiff did not sustain its burden, the court held that there was a reasonable basis for the BRA "since Mobil's refinery is not being taxed under a different scheme than every other refinery in the state." Id. at 21.

*Tax Exemptions Based on Character of the Property*

PSE&G categorizes the Municipality's position as a "status of the owner" argument and directs the court's attention to the New Jersey Supreme Court decision in Town of Morristown v. Women's Club of Morristown, 124 N.J. 605 (1991). In that case, the Town challenged the constitutionality of N.J.S.A. 54:4-3.52, which provided a tax exemption for property certified as historic and owned by a nonprofit corporation. It was a hybrid exemption, much like the charitable one provided under N.J.S.A. 54:3-6. It had a "character of the property" requirement, that the property be certified as historic, and a "status of the owner" requirement, that the property be owned by a nonprofit corporation. The Court found the exemption to be valid.

In reaching its conclusion, the Court made it clear that since 1954 – indeed, since 1844 –

the Supreme Court "has consistently held that classifications involving the character or use of property are constitutional and that those based exclusively on the owner's status are not." Id. at 614. The Court found that "[t]he historic site exemption is 'based upon features that inhere in the property itself'", i.e., its historical significance. Women's Club of Morristown, 124 N.J. at 614 (quoting N.J. Turnpike Authority v. Washington Twp., 16 N.J. 38, 45 (1954)). It also found that the classification between historic and non-historic sites rested upon a "substantial distinction" of having a "logical and reasonable basis", i.e., the importance of preserving historic landmarks. Women's Club of Morristown, 124 N.J. at 615 (quoting Gen. Elec. Co. Passaic, 28 N.J. 499, 508 (1958), appeal dismissed, 359 U.S. 1006, (1959)).

The Court also rejected the argument that "the statute unlawfully accords an exemption to nonprofit owners of certified historic sites because all other owners of similarly certified sites do not qualify for such treatment." Women's Club of Morristown, 124 N.J. at 618. It found that "the distinction drawn by the Legislature between nonprofit organizations and other owners bears a rational relationship to the Legislature's goal of preserving historic sites" because it would ensure that the tax exemption is granted to corporations whose sole purpose is limited by statute and is consistent with the purposes of the tax exemption. Ibid.

Thus, a tax exemption is valid under uniformity analysis if the classification made by the Legislature: (1) involves the character or use of property; and (2) is rational. The Legislature may further limit the exemption based upon the status of the owner so long as it is not its exclusive classification, and it is likewise reasonable.

25

*Analysis*

To determine a statute's purpose, we first consider the statute's words. "Thus, our analysis of a statute begins with its plain language, giving the words their ordinary meaning and significance. [citation omitted] Where the language is clear and unambiguous . . . we must infer the Legislature's intent from the statute's plain meaning." Johnson & Johnson v. Director, Div. of Taxation, 461 N.J. Super. 148, 162 (2019) (citing Garden State Check Cashing Serv. Inc. v. State, Dep't of Banking & Ins., 237 N.J. 482, 489 (2019)).

From the statute's unambiguous nature, the court finds that the Site falls under BRA's 1997 provision. The court also finds that the Legislature unambiguously intended to grant a local property tax exemption to the machinery, apparatus, and equipment of current or former remitters of the transitional energy, including PSE&G. If the court removes the statutory section that is purportedly unconstitutional "as applied" to the Site, then it ultimately results in an "utterly inoperative" provision.

If the court were to find that the BRA is unconstitutional "as applied" to the Municipality, then all municipalities would be able to tax a remitter of transitional energy facility in a similar fashion. Such a result negates the statute's plain language and renders it inapplicable under any circumstance. This contradicts our Supreme Court's decision in General Motors Corp., and the Legislature's intent. Therefore, no application of N.J.S.A. 54:4-1.17 would be deemed constitutional. The installation of six (6) new General Electric LM6000 generators by PSE&G at the generating station, qualify as machinery, apparatus, or equipment, and they reasonably would not have been defined as real property during the passage of the 1947 New Jersey Constitution. The court finds that the BRA does not violate the Uniformity Clause of the New Jersey

26

Constitution.

The Municipality supports their "as applied" claim by stating that, because statutes must be construed to avoid constitutional defect, as a remedy to preserve constitutionality, it must be afforded the opportunity to capture the value of PSE&G's investment at the Site. The court cannot accomplish this without assuming the power of the Legislature, which is a gross overstep of the court's role.

As a result, the court determines that the Municipality's challenge is a "facial" challenge, which fails under General Motors Corp. "The Legislature is free to tax personal property in any way so long as the classification is reasonable, and the property is assessed under general laws and by uniform rules." General Motors Corp., 150 N.J. at 526. Since the BRA specifically does not tax land and buildings, but rather prevents taxation of personal property, i.e., machinery, apparatus, or equipment, the Uniformity Clause does not apply. Moreover, the Court in General Motors Corp. held that the BRA "is facially constitutional because it may be reasonably interpreted as not to create an unconstitutional exemption for real property." General Motors Corp., 150 N.J. at 524.

The BRA also satisfies the Women's Club of Morristown test. The BRA states that "[n]othing in this act shall be construed to limit municipal taxation of real estate pursuant to [N.J.S.A. 54:4-1] of current or former remitters of the transitional energy facility assessment, or of a corporate or non-corporate legal successor or assignee of a current or former remitter of the transitional energy facility assessment whether through any reorganization, sale, bankruptcy, consolidation, merger or other transaction or occurrence of any kind without limitation." This gives the Municipality – in case any other provision of the statute is construed otherwise – the

27

general power to tax the real estate of a "current or former remitters of the transitional energy facility assessment." This is true now and was true when utilities were paying the GR&FT.

Paragraph (a), after establishing the general power to tax real estate, exempts certain types of property from exemption: "As used in this section, 'real estate' means lands and buildings, but shall not include items of the type set forth in the list of scheduled property for gas systems and electric light, heat and power systems in [N.J.S.A. 54:30A-58] prior to January 1, 1998." N.J.S.A. 54:4-1.17. "As provided in that list," the statute continues, "railways, tracks, ties, lines, wires, cables, poles, pipes, conduits, bridges, viaducts, dams and reservoirs (except that the lands upon which dams and reservoirs are situated shall be included as real estate), machinery, apparatus or equipment, notwithstanding any attachment thereof to lands and buildings owned by current or former remitters of the transitional energy facility assessment, or of a corporate or non-corporate legal successor . . . are not real estate." Ibid.

Paragraph (b) of the statute applies this exemption to scheduled property housed on property and not owned by a utility. If it is occupying the site by lease, license, easement or other arrangement, "[n]o municipality, regional or county governmental agency shall directly or indirectly tax as real property, or include within the assessment of real property, the public utility owned electric interconnect . . . or any value thereof which were set forth in the list of scheduled property for gas systems and electric light, heat and power systems in [N.J.S.A. 54:30A-58] prior to enactment of this act whether or not on the real estate of current or former remitters of the transitional energy facility assessment." Ibid.

The former statute defined "scheduled property" as "only those classes or types of property of a taxpayer set forth in section 10 of this act and which are used in computing the

28

apportionment value as herein defined." Among other things, the list of "scheduled property" includes, under "Electric Light, Heat and Power Systems," "Electric Generating Stations," "Substations," "Switching Stations," "Towers," "Poles," "Conduit," "Conductors," and "Line transformers." Id. at 654-55. This definition encompasses virtually all property except for the lands and buildings at the Kearny Generating Station and Switching Station.

After applying the uniformity analysis, the court determines that the Legislature made its classification based upon the character or use of property: The list of scheduled property describes the property, not the owner. Although a building is taxable, a transformer is not, even though both buildings and transformer occupy the same site and are owned by the same taxpayer. The exemption first turns not on the status of the owner, but on the character of the property. That being the case, it cannot be said that the classification is based exclusively on the status of the owner, even if that status is a secondary requirement of the statute.

Next, the court examines the reasonableness of an exemption for scheduled property owned by current or former remitters of the transitional energy facility. The statute's overall purpose was to reduce the cost of electricity for New Jersey residents, who were paying rates approximately 50% above the national average. The Legislature sought to accomplish this purpose, in part, by severing power production from transmission and distribution.

Prior to the statute's enactment, ratepayers were forced to purchase electricity from the one company, designated to produce, transmit and distribute power within the region. Ratepayers now may elect to contract with independent power producers and marketers, often located in neighboring states and even neighboring countries, to encourage competition. They are still required to utilize the transmission and distribution services of the public utility, which are, by

29

necessity, local activities, and therefore remain under BPU jurisdiction.

The Legislature also sought to accomplish this purpose by exempting the local equipment which produces, transmits, and distributes electricity – as necessary to a functioning civilization as roadways, reservoirs, and sanitary facilities are – from local real property taxation, a cost which would otherwise be shoveled directly into rate-making applications to the BPU. This not only reduces the cost to ratepayers, but also insulates local power producers from the competitive advantages of foreign producers, who enjoy more favorable tax treatment, and requires them to pass those savings on to ratepayers. It is also essential for local job retention and local power security. Stated simply, the production, transmission and distribution of electricity is an essential service for New Jersey residents.[27]

Thus, the classification of certain types of property as exempt – scheduled properties used in the production, transmission, and distribution of electricity – is reasonable. The classification of certain beneficiaries, current and former remitters of the transitional energy assessment, was also reasonable. The Legislature sought to limit the exemption to current or former remitters because only those companies are subject to the TEFA and the UTUA; only those municipalities which accommodate exempt facilities receive an allocation of the Energy Tax Act subsidies.

Since each remitter of transitional energy facility in New Jersey operates under the same tax scheme, their machinery, apparatus, and equipment are exempt from being included as real

---

[27] See, New Jersey Board of Public Utilities, "About," https://www.bpu.state.nj.us/bpu/about/index.html ("The New Jersey Board of Public Utilities is the state agency with authority to oversee the regulated utilities, which provide critical services such as natural gas, electricity, water, telecommunications, and cable television. The law requires the Board to ensure safe, adequate, and proper utility services at reasonable rates for customers in New Jersey.").

estate. The BRA applies to all remitters of transitional energy facilities, not just the Kearny generating station. N.J.S.A. 54:4-1.17 qualifies as general legislation with a broad application and not as an unlawful special legislation affecting just one taxpayer. Moreover, as stated above, the Legislature maintained a rational and reasonable basis for excluding the machinery, apparatus, or equipment, of a remitter of transitional energy facility to foster business opportunities in the manufacturing sector and to decrease overall energy costs in the state. Therefore, N.J.S.A. 54:4-1.17 is not a special legislation that violates the New Jersey Constitution.

**Part Two – Dual Filing Jurisdictional Question**

In its cross-motion for partial summary judgment, PSE&G questions whether this court has jurisdiction to review the Dismissal without Prejudice county board judgments for those properties and tax years[28] wherein PSE&G filed direct appeals with Tax Court. PSE&G argues that "where duplicate appeals are filed in the Tax Court and the County Board of Taxation on the same property, the appeal initiated in the County Tax Board – which had no jurisdiction to act – should be dismissed." The court disagrees with PSE&G's position for the reasons expressed by this Court in 30 Journal Square Partners, LLC v. City of Jersey City, 32 N.J. Tax 91 (2021).

The pertinent statute provides as follows:

> a taxpayer feeling aggrieved by the assessed valuation or exempt status of the taxpayer's property or a taxing district . . . may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later, appeal to the county board of taxation by filing with it a petition of appeal; provided, however, that any such

---

[28] PSE&G filed direct appeals under docket numbers 011141-2015, 010659-2016, 009771-2017, 010030-2018, 011140-2015, 007032-2016, 004745-2017, 006122-2018, 007190-2019, 002432-2020, 002473-2021.

taxpayer or taxing district may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later, file a complaint directly with the Tax Court, if the assessed valuation of the property subject to the appeal exceeds $1,000,000.

[N.J.S.A. §54:3-21.]

It is undisputed that a County Board's jurisdiction is extinguished by a legitimate and timely direct appeal to the Tax Court. The court, however, rejects PSE&G's position that the Municipality's failure to file a timely counterclaim to PSE&G's direct appeals, as opposed to appealing the county board judgments, results in the Municipality losing all rights and remedies associated with its original timely filing with the County Board.

The factual scenario presented here is not meaningfully distinguishable from those in 30 Journal Square, LLC.[29] Thus, this court's analysis and conclusion in the present matter is an extension of this court's earlier decision:

> In the absence of a clear and concise procedural mechanism to effectuate the transfer of a Board petition to the Tax Court pursuant to N.J.S.A. 54:3-21(a), the court accepts the Board's current practice, namely the issuance of a Memorandum of Judgment with Code #6B – Dismissal Without Prejudice – Hearing Waived. This provides the Tax Court with jurisdiction over the entire matter as required by N.J.S.A. 54:3-21(a). It also provides Jersey City the opportunity to continue to challenge the assessments at issue by the filing of a timely appeal to the Tax Court in compliance with the referenced statute. The dismissal-without-prejudice judgment by the Board is not an adjudication on the merits and will not be considered a nullity. The court rejects Plaintiff's remaining argument that Jersey City was required to file a counterclaim per N.J.S.A. 54:3-21(a)(1).

---

[29] The Town ("Jersey City") in 30 Journal Square filed timely appeals to the County Board challenging assessments on eleven properties, and the Plaintiff ("30 Journal Square") filed appeals on the same properties directly to the Tax Court.

[30 Journal Square Partners, LLC, 32 N.J. Tax at 102.]

The court is unaware of any facts or law that would distinguish this case from 30 Journal Square Partners, LLC and would entice the court to change its rational or determination on this jurisdictional issue.

## IV. Conclusion

For the reasons expressed above, the court finds that the Municipality's motion for partial summary judgment is a "facial" challenge with respect to the constitutionality of the BRA.

The BRA applies to all remitters of transitional energy facilities, not just PSE&G's generating station and the Site. Any ruling in favor of the Municipality would result in a finding that all applications of the BRA exemption are unconstitutional: allowing all municipalities the ability to tax a remitter of transitional energy in a similar fashion regardless of whether the machinery, apparatus, and equipment and business personal property are subject to a statutorily authorized exemption under the BRA. Such a result negates the statute's plain language and renders it inapplicable under any circumstance. This contradicts our Supreme Court's decision in General Motors Corp., and the Legislative intent of the statute.

The court also finds that the BRA does not violate the Uniformity Clause of our State Constitution. The natural gas-fired generators installed by PSE&G at the generating station, constitute machinery, apparatus, and equipment, which reasonably would not have been defined as real property during the passage of the 1947 New Jersey Constitution. PSE&G and every other remitter of transitional energy in the State operate under the same tax scheme and, as such, their machinery, apparatus, and equipment are exempt from qualifying as real estate. The BRA serves

33

as a general legislation with a broad application and not an unlawful special legislation affecting just one taxpayer. The Legislature held a rational and reasonable basis for excluding the machinery, apparatus, and equipment of a remitter of transitional energy facility to foster business opportunities in the manufacturing sector and to decrease overall energy costs.

If the Municipality feels it should receive an increase in revenue because of PSE&G's investment in machinery, apparatus, and equipment at the Site, the appropriate action would be to ask the Legislature to address this issue.

In addition, the court holds that it maintains exclusive jurisdiction over the Municipality's Complaints, which appealed the county board judgments; the relevant Complaints were filed after PSE&G's filing of direct complaints to the Tax Court.[30] N.J.S.A. 54:3-21(a) does not negate a County Board's ability to issue judgments dismissing the pending petitions without prejudice.

As for PSE&G's severability argument, the court does not find it to be applicable for the reasons set forth in the State's brief. PSE&G's claimed BRA exemption for the machinery, apparatus, or equipment of a remitter of transitional energy facility is not expressly related to whether the Municipality receives funds under the Energy Tax Act. Moreover, there is no dispute in the record regarding the revenue received by the Municipality pursuant to the Energy Tax Act. As such, the court does not need to address the severability argument in this decision.

As to the issues remaining in these matters, Case Management Orders setting trial dates shall be uploaded separately on ECourts. The court also attached the Order to this decision.

---

[30] 010910-2013, 011141-2015, 010659-2016, 009771-2017 , 010030-2018, 000204-2019 and 000205-2019, 011140-2015, 007032-2016, 004745-2017, 006122-2018, 007190-2019, 002432-2020, 002473-2021.

/s/ Mary Siobhan Brennan
Hon. Mary Siobhan Brennan, J.T.C.